**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MINNESOTA**

| | |
|---|---|
| NETCHOICE,<br><br>*Plaintiff,*<br><br>v.<br><br>KEITH ELLISON, in his official capacity as Attorney General of Minnesota; and DR. BROOKE CUNNINGHAM, in her official capacity as Commissioner of Minnesota Department of Health,<br><br>*Defendants*. | Civil Action No. 0:26-cv-2405 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Every day, hundreds of millions of Americans open social media websites to read the news, check in on friends, watch a lecture, observe a religious service, debate politics, learn something new, or share a photograph. Beginning July 1, 2026, Article 19, Section 13 of Minnesota House File 2 (2025) (the "Act" or "Section 13") will force an overbroad and vaguely defined set of "social media" websites and applications to provide a state-authored warning about the constitutionally protected speech on the platform to every user every single time they access the site. *See* Ex. 1 (text of Act). That is true whether the user is seventeen or seventy, whether she is watching a cooking tutorial or following a presidential campaign. She cannot permanently dismiss the warning. She cannot make it disappear without first "acknowledg[ing] the potential for harm and choos[ing] to proceed . . . despite the risk." § 325M.335(1)(a)(2). And she cannot avoid it no matter how many hundreds of times she has already complied. § 325M.335(1)(a)(2), (1)(b), (1)(c). And the websites and applications forced to disseminate this message may not add a single word

1

of their own if doing so "obscures the visibility or prominence" of the State's speech—even if only to clarify that the message is the State's, not their own. § 325M.335(1)(c).[1]

2.       The one "fixed star in our constitutional constellation" is that the First Amendment prohibits the government from compelling private actors to speak the State's preferred message. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Section 13 does exactly that. Colorado's materially similar compelled-speech warning requirement has already been enjoined. *NetChoice v. Weiser*, 808 F. Supp. 3d 1223 (D. Colo. 2025) (requiring warning label only for minor users), *appeal docketed*, No. 25-01456 (10th Cir. Dec. 9, 2025). The Court should enjoin the enforcement of this law too.

3.       "In this Nation, no official . . . may command our tongues or silence our voices." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (citation omitted). The First Amendment's protections "include[] both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The "government may not compel a person to speak its own preferred messages"—least of all when the speaker is itself engaged in expressive activity and "would prefer to . . . present [its expressive compilation] undiluted by" the government's preferred message. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (discussing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual*

---

[1] This lawsuit only challenges Article 19, Section 13 of House File 2, enacting § 325M.335. Thus, references to "Act" or "Section 13" include only Article 19, Section 13—and not the rest of House File 2. Unless otherwise noted, statutory citations in this Complaint refer to the Minnesota Revised Statutes. This Complaint uses the shorthand "websites" to refer to all regulated "social media platform[s]"—which include "electronic medium[s]" such as "browser-based or application-based interactive computer service[s], Internet website[s], telephone network[s], or data network[s]." § 325M.31(j).

*Grp. of Boston, Inc.*, 515 U.S. 557, 572-73 (1995)). These First Amendment principles "do[] not go on leave when social media are involved." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024); *e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) ("*Bonta I*") (invalidating compelled-speech requirement for websites); *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (similar).

4.      The Act violates these principles many times over. The State has myriad ways to speak and persuade its residents. But the Act instead compels regulated websites and applications to speak the State's message and "warn the user of potential negative mental health impacts of accessing the social media platform," by choosing a prescribed warning message from the State's four-page list of approved warnings. § 325M.335(1)(b). And it simultaneously silences the speakers it has conscripted by barring websites from engaging in their own speech. Specifically, the Act prevents websites from providing "extraneous information in the warning label that obscures the visibility or prominence of the warning label." *Id.*

5.      These warning notifications must persist until the user either "exits the social media platform" or—in the State's words—"acknowledges the potential for harm and chooses to proceed to the social media platform despite the risk." § 325M.335(1)(a)(2), (1)(b). And users cannot permanently disable the warnings. § 325M.335(1)(b). The Act is designed to block, burden, and browbeat "social media" users as they seek to access websites that allow users to "engage in a wide array of . . . activity on topics 'as diverse as human thought.'" *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (citation omitted).

3

6. Court after court has enjoined enforcement of laws burdening access to the fully protected speech on social media websites. *See id.* at 107; *NetChoice v. Griffin*, 2026 WL 1068565, at *5 (W.D. Ark. Apr. 20, 2026) ("*Griffin IV*"); *NetChoice v. Jones*, 2026 WL 561099 (E.D. Va. Feb. 27, 2026); *NetChoice v. Murrill*, 812 F. Supp. 3d 594 (M.D. La. 2025); *NetChoice v. Griffin*, 812 F. Supp. 3d 905 (W.D. Ark. 2025) ("*Griffin III*"); *Weiser*, 808 F. Supp. 3d 1223; *NetChoice v. Carr*, 789 F. Supp. 3d 1200 (N.D. Ga. 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

7. Minnesota's attempt to compel a content-based and vaguely defined collection of "social media platforms" to discourage users from using their services is equally unlawful. After all, "a government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (citation omitted).

8. Compounding these problems, the Act's mandates are unconstitutionally vague. The Act's core "[s]ocial media platform" coverage definition relies on vague terms that leave websites uncertain about whether they must speak the Act's preferred message. § 325M.31(j). And for those websites that *are* forced to speak, the Act does not explain precisely what they can—and cannot—say. The State has provided *four pages* of potential warning messages, with little guidance about which—and how many—of the messages the websites must convey. And the Act does not clearly explain what counter speech the

4

websites may engage in, because it also prohibits "extraneous information in the warning label that obscures the visibility or prominence of the warning label." § 325M.335(1)(b).

9.    This Court should enjoin Defendants from enforcing Article 19, Section 13 of the Act against Plaintiff NetChoice's covered members and declare Article 19, Section 13 of the Act unlawful.

## PARTIES & STANDING

10.    Plaintiff NetChoice is a District of Columbia nonprofit trade association for internet companies. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the internet, while minimizing burdens that could prevent businesses from making the internet more accessible and useful. NetChoice's members are listed at NetChoice, About Us, https://perma.cc/9H9U-KN45.

11.    NetChoice has associational standing to challenge the Act because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge to the Act's compelled-speech requirements. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 532-33 (8th Cir. 2005); *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025).

12.    Based on the Act's central coverage definition, § 325M.31(j), the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Automattic, which owns and operates Tumblr; (2) Discord; (3) Meta, which owns and operates Facebook, Instagram, Messenger, Threads, and WhatsApp; (4) Nextdoor; (5) Pinterest;

(6) Reddit; (7) Snap Inc., which owns and operates Snapchat; (8) TikTok Inc. and TikTok USDS Joint Venture LLC; (9) X; and (10) YouTube. This Complaint refers to members with services that the Act regulates as "members."

13.    NetChoice also has standing to assert the First Amendment rights of its members' users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *Fitch*, 134 F.4th at 805-07.

14.    Defendant Keith Ellison is the Minnesota Attorney General. He is a Minnesota resident and is sued in his official capacity. Defendant Ellison has authority to enforce the Act under § 325M.34.

15.    Defendant Dr. Brooke Cunningham is the Commissioner for the Minnesota Department of Health. She is a Minnesota resident and is sued in her official capacity. Defendant Cunningham has promulgated "guidelines . . . that contain appropriate requirements for the warning labels required under" the Act. § 325M.335(2); *see* Minn. Dep't of Health, Minnesota Social Media Mental Health Warning Label Guidelines (Feb. 27, 2026), https://perma.cc/S6JU-Z7RE ("DoH Guidelines"), attached as Ex. 2.

## JURISDICTION & VENUE

16.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

17.    Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

18. This Court has personal jurisdiction over Defendants because they reside in and conduct a substantial proportion of their official business in Minnesota.

19. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in, and the events giving rise to this civil action occurred in, Minnesota.

## BACKGROUND

20. **NetChoice members' covered websites—like other covered social media websites—disseminate and facilitate speech that is fully protected by the First Amendment.** NetChoice's covered members allow their users to "create, share, and view user-generated content for a substantial purpose of social interaction, sharing user-generated content, or personal networking." § 325M.31(j).

21. Such covered websites allow users to read, watch, listen, and exchange ideas on subjects "as diverse as human thought," including politics, religion, art, science, and the ordinary interactions of daily life. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 852 (1997) (citation omitted). People use these services to "gain access to information and communicate with one another." *Packingham*, 582 U.S. at 107.

22. Covered websites operate at extraordinary scale—both individually and in combination. These "social media" services disseminate and facilitate "billions of posts" of fully protected speech. *Moody*, 603 U.S. at 734. Users post text, images, audio, and video. And they also communicate by commenting, reacting, and responding in the multiple billions of times per day on covered services.

23. NetChoice members also "engage[] in expression" of their own through their "display" and "compiling and curating" of protected content "created by others." *Id.* at 728,

7

731, 740. NetChoice members exercise protected editorial judgment in how they design their expressive services, including how they select, rank, recommend, and present speech to users. *See id.* at 728.

24.     **Minnesota has multiple avenues to speak to—and attempt to persuade—its residents.** Minnesota has many means to speak to its residents and provide its own opinions about "social media" use.

25.     For instance, multiple Minnesota officials can provide public-facing information about use of the internet. They already do so. *See* Minn. Dep't of Educ., Digital Literacy and Internet Safety (2025), https://perma.cc/SY9L-L7TP; Minn. Dep't of Health, THE MINNESOTA PARTNERSHIP FOR ADOLESCENT HEALTH: Safe and Secure Places to Live, Learn, and Play (June 17, 2025), https://perma.cc/55PX-3N3T.

26.     Minnesota officials could engage in systematic public campaigns to ensure that their opinions reach the desired audiences, as they do on many other topics.

27.     Minnesota could also require schools and other government entities to provide digital literacy instruction about technology and social media use. *See, e.g.*, ExcelinEd, State Approaches to Digital Literacy Instruction (Feb. 2024), https://perma.cc/J9JQ-B88B.

28.     And Minnesota does not need to do any of this alone: It can partner with any number of third parties and any number of communities to spread the State's opinion.

29.     **NetChoice members voluntarily provide extensive resources to promote digital wellbeing.** NetChoice members invest heavily in tools, information, and partnerships designed to help users make informed decisions about their online experience.

30.     Meta has worked closely with experts, parents, guardians, and teens to develop Meta's Family Center, a central place for parents to oversee their teens' accounts within Meta technologies, set up and use supervision tools, and access resources on how to communicate with their teens about internet use. Family Center is a central place for parents and guardians to access supervision tools and resources from leading experts. Adam Mosseri, *Introducing Family Center and Parental Supervision Tools on Instagram and in VR*, Meta (Mar. 16, 2022), https://tinyurl.com/e27z6957. Meta works closely with groups like Connect Safely and Net Family News to develop resources for parents and guardians to help them have meaningful and open conversations with their teens about being online. Family Center includes an education hub where parents and guardians can access resources from experts and review helpful articles, videos and tips on topics like how to talk to teens about social media. Parents can also watch video tutorials on how to use the new supervision tools available on Instagram today. Meta, Discover the Meta Family Center resources hub, https://perma.cc/54DA-7TH6. Meta wants parents to have the information to help their teens have a safe and positive experience on Instagram. In the US, Meta has collaborated with The Child Mind Institute and ConnectSafely to publish a new Parents Guide. It includes the latest safety tools and privacy settings, as well as a list of tips and conversation starters to help parents navigate discussions with their teens about their online presence. Instagram, Helping your teen navigate Instagram safely, https://perma.cc/55C5-5LLA. Meta has also built resources for teens and their parents, caregivers, and educators, working to improve digital literacy. These resources help young people navigate their time online and empower them to create the safe experiences they

9

want. Meta, Get Digital!, https://perma.cc/ZH5R-PUEJ; Meta, Youth safety, https://perma.cc/K8H5-P6ZE.

31.   Pinterest is the founding signatory of the Inspired Internet Pledge, created with the Boston Children's Digital Wellness Lab, which "is a call to action for tech companies and the broader digital ecosystem to unite with the common goal of making the internet a safer and healthier place for everyone, especially young people." Pinterest, The Inspired Internet Pledge, An Industry-Wide Initiative to Create a Safer and Healthier Internet (June 20, 2023), https://perma.cc/Y9YP-D9E2. Pinterest's Help Center also provides resources and information to parents about their teen's use of Pinterest and social media generally. Pinterest, Help Center: Resources for Parents and Caregivers of Teens, https://perma.cc/R82R-PRV7. Pinterest notes that "[t]hrough expert research, we've found that spending time on Pinterest improves young people's emotional wellbeing," and links to a study conducted with University of California Berkeley on the power of inspirational content. *Id.*

32.   In its "Mental Health and Support Resources" page, Reddit offers links to resources for users struggling with thoughts of self-harm, eating disorders, domestic abuse, sexual violence, and substance abuse. Reddit, Mental Health and Support Resources, https://perma.cc/2BKR-9D92.

33.   Snap Inc. provides resources and toolkits for online wellbeing. *E.g.*, Snap Inc., Educator Tools & Resources, https://perma.cc/DYY9-K457; Snap Inc., Parents: Snapchat Tools and Resources, https://perma.cc/8GMU-KKU6. These resources include Snap Inc.'s "A Parent's Guide to Online Safety," which was created through a partnership with

Childnet, an online safety charity, to provide information to parents and teens about use of social media. Snapchat & Childnet, A Parent's Guide to Online Safety, https://perma.cc/37BS-XPUS. (More generally, Childnet provides numerous guides, help, and advice for parents, teachers, and teens about social media and internet use. *See* Childnet, Home, https://perma.cc/AG6U-J53W.) Snapchat is also a signatory of the Inspired Internet Pledge.

34.     TikTok offers a variety of tools and information to help users of all ages manage their experience on the platform. Among other things, TikTok offers a Time and Well-being Page, a dedicated in-app space designed to help users unwind, reset, and cultivate balanced digital habits. It offers advice on how to assess digital well-being, tips for reflecting on screentime, and resources for distressed community members. It also provides tools to help an individual manage their platform experience: including the ability to set daily screen time limits and breaks, review a screen time dashboard, and switch to restricted mode—which limits the appearance of content that may not be appropriate for all audiences. TikTok has also introduced "Well-being Missions," "a series of short, engaging missions designed to help people develop long-term balanced digital habits." TikTok, New Ways We're Helping Our Community Build Balanced Digital Habits (July 30, 2025), https://perma.cc/6K9M-AYFU. Notably, while all users can set screen time limits, they are set to one hour by default for 13-17 year olds (parents can also manage their teens' screen time through Family Pairing). TikTok Support, Screen time (April 24, 2026), https://perma.cc/28WW-NG6P. Finally, TikTok offers a Safety Center and a Teen Safety Center that are accessible both through the app and via browser. These hubs help users with

managing interactions (including setting an account to private, blocking/muting other users, and reporting accounts or content that violates TikTok's Community Guidelines). The centers also provide support resources for suicide and self-harm, substance abuse, gambling, sexual abuse, and bullying prevention. TikTok, Safety Center, https://perma.cc/7FQT-64QA; TikTok, Teen Safety Center, https://perma.cc/NBP8-UX7V.

35.    YouTube provides "tools and resources" to parents of teens "to help" parents manage teens' "experience on YouTube" and answer questions "about their teen's behavior and wellbeing online." YouTube Help, Tips and Resources for Parents of Teens on YouTube, https://perma.cc/A9P8-LZ5L. These resources include YouTube's "Family Guide to Teen Content Creation" and various Family Guides on topics from safety to wellbeing. *Id.*

36.    **Existing options for parental control and oversight.** Parents have many existing and diverse choices to regulate and oversee whether and how their minor children use the internet.

37.    There are resources that collect all these parental tools in one place. *E.g.*, Internet Matters, Parental Control Guides, https://perma.cc/RN3U-ETA7.

38.    These existing market solutions allow parents to tailor their approaches to the needs of their families.

39.    Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the internet.

40.    Cellular and broadband internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Smart Family,

12

https://perma.cc/7NFN-7E85; AT&T, AT&T Secure Family, https://perma.cc/6TBF-V8ZW; T-Mobile, Family Controls and Privacy, https://perma.cc/4E4H-43JY.

41. Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and unblock websites with parental controls on Firefox (Aug. 11, 2022), https://perma.cc/JPB2-VVNM. Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, Choose parental controls that are right for your family, https://perma.cc/B97S-KZVN. Parents can also use widely available browser extensions to reinforce these tools.

42. Wireless routers often have settings allowing parents to block particular websites, filter content, monitor internet usage, and control time spent on the internet. *See, e.g.*, Netgear, Netgear Smart Parental Controls, https://perma.cc/DQR7-FJBJ; tp-link, How to configure Parental Controls on the TP-Link Wi-Fi Router (Oct. 21, 2025), https://perma.cc/5GXH-GTJ3.

43. Devices allow parents to limit the time their children spend on the device, block specific applications, filter content, and control privacy settings. *See* Apple, Use parental controls on your child's iPhone or iPad (May 5, 2025), https://perma.cc/D8DZ-WG3E; Google Family Link, Help keep your family safer online, https://perma.cc/FZM7-X53Z; Microsoft, Set up Microsoft Family Safety (2026), https://perma.cc/D844-ZUAY; Samsung, Manage Family groups and parental controls with your Samsung Account, https://perma.cc/7Z3J-FXUF; Samsung, Use Digital Wellbeing features on your Galaxy phone or tablet, https://perma.cc/Z5R9-HU7X; Android Help, Manage how you

spend time on your Android phone with Digital Wellbeing (2026), https://perma.cc/3U6X-N34V.

44.    Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Benedict Collins, *Best Parental Control App of 2026: Expert Testing, Ranking and Reviews*, TechRadar (Jan. 8, 2026), https://perma.cc/N7DL-RUTF.

45.    **Parental tools provided by NetChoice members.** In addition, NetChoice members provide parents and minors with many tools and options to help ensure that minor children are responsibly using their services.

46.    Discord, through its Family Center, allows parents to monitor their children's weekly activity, including the following: new friends on the app, other users their children have recently messaged or called, total time on voice and video chats, all users and servers children have joined, and total purchases made. Discord, Family Center for Parents and Guardians, https://perma.cc/7VE7-CNEQ. In Family Center, parents can also adjust the content that children are allowed to see (blurring or blocking impermissible content), adjust who can send their children both friend requests and direct messages, and see every account their teen has connected to. *Id.*

47.    Parents and guardians can use supervision tools on Facebook and Instagram to set daily time limits for their teens or block use during select days and hours; set reminders to close the apps; see the average amount of time their teen has spent on Facebook and Instagram over the last week (and the total time spent on Facebook and Instagram for each specific day over the last week); see who their teen follows and who follows their teen; see

which accounts their teen is currently blocking; see when their teen reports someone and for what reason; approve or deny their teens' requests to change default safety and privacy settings to a less strict state; and see their teen's settings for account privacy, messaging, and sensitive content. *See, e.g.*, Instagram, Help Center, Parental Supervision (2026), https://tinyurl.com/356rttjy; Facebook, Help Center, Safety Resources for Parents (2026), https://tinyurl.com/yu9mvvv5. Meta also gives parents the ability to see who their teens are messaging with and see the age-appropriate topics teens have chosen to see content from. Meta also offers built-in time management tools for teens and encourages teens to create boundaries around how much time they spend on Instagram and Facebook. With Teen Accounts, teens are automatically placed into daily time limit notifications after they've spent 60 minutes on Instagram. Sleep Mode is also turned on automatically, which mutes notifications overnight and sends auto-replies if someone tries to DM them. Teens under 16 can't change these settings without a parent's permission. Meta also allows parents to set daily time limits and regular breaks when their teens can't use Meta apps. Meta, Creating safe, age-appropriate experiences on Instagram, https://perma.cc/7Z9N-69K8; Meta, Giving Teens and Parents More Ways to Manage Their Time on Our Apps, https://perma.cc/3M4K-682Q. Meta first launched Instagram "Teen Accounts" in 2024 and has since expanded Teen Accounts to Facebook and Messenger. Teen Accounts reimagined the Instagram experience for millions of teens, with built-in protections to address parents' top concerns, including who their teens are talking to online, the content they're seeing and whether their time is being well spent. With Teen Accounts, teens are defaulted into private accounts and people who don't follow them can't see their content or interact with them;

15

teens are placed in the strictest messaging settings, so they can only be messaged by people they follow or are already connected to; teens are automatically placed into the most restrictive setting of sensitive content control, which limits the type of sensitive content they see; teens can only be tagged or mentioned by people they follow; offensive words and phrases are filtered out of teens' comments and DM requests; teens get notifications telling them to leave the app after 60 minutes each day; and sleep mode is turned on between 10 PM and 7 AM, which mutes notifications overnight and sends auto-replies to DMs. With Teen Accounts, safety protections are turned on automatically for all teens but minors under 16 need a parent's permission to change any of these Teen Accounts settings to be less strict. Since launching Teen Accounts, Meta added new restrictions for Live and unwanted images in DMs, as well as revamped the Instagram Teen Account experience to be guided by 13+ movie ratings by default. This means, when rolled out fully, teens will see content on Instagram similar to what they'd see in a 13+ movie. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://perma.cc/6UA9-KZEZ; Meta, We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger (Apr. 8, 2025), https://perma.cc/P4BB-HH5H.

48.     Pinterest is running an experiment on reminders during the school day that remind minor users who "open the Pinterest app during the school day" to "put down [their] phone[s], pause notifications, and focus on school." Pinterest, Help Center, Resources for parents and care-givers of teens (2026), https://perma.cc/SB8E-6LTY.

49. Snapchat's "Family Center" allows parents to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report abuse. *See* Snapchat Support, What is Family Center?, https://perma.cc/R988-JL6E.

50. TikTok has a "family pairing" feature that allows parents to, among other things, set a screen time limit, restrict exposure to certain content, decide whether their teen's account is private or public, turn off direct messaging, and decide who can comment on their teen's videos.

51. X defaults known minors' accounts to "protected posts." *See* X, Help Center, Information for Parents and Minor Users, https://perma.cc/8XTV-NDFS. "This means that known minors will receive a request when new people want to follow them (which they can approve or deny), that their posts will only be visible to their followers, and that their posts will only be searchable by them and their followers (i.e. they will not appear in public searches). Furthermore, once these accounts enter a date of birth that makes them under the age of 18, they will be stopped from re-entering a new date of birth." *Id.* X excludes from its recommender system "potentially harmful content." *Id.* Further, X "prohibit[s] users from promoting or encouraging suicide or self-harm," and if someone "searches for terms associated with suicide or self harm, the top search result is a notification encouraging them to reach out for help." *Id.*

52. YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions);

17

and (3) to choose whether to link accounts between a parent and teen. YouTube, Exploration starts here: Choices for every family, https://perma.cc/5XSA-7BWG. YouTube has also developed features and policies directed at promoting digital wellbeing among users. *Id.* YouTube also has a "Take a Break" feature that lets a user set a reminder to take a break while watching videos. *See* YouTube Help, Take a Break Reminder, https://perma.cc/V3RF-VLCE. This feature pauses the user's video until they dismiss it or resume playing the video and is defaulted on for minors but is available for all users.

53.    **Covered websites invest heavily in content moderation and beneficial user experiences.** NetChoice's members expend vast resources to improve their services and curate the third-party speech disseminated on their websites to best ensure that it is appropriate for the community of users they seek to foster. *See* Malena Dailey, By The Numbers: What Content Social Media Removes And Why 13 (2021), https://perma.cc/ML9R-PUFP. Covered services like "Facebook and YouTube" "cull and organize uploaded posts" to conform with those platforms' "content-moderation policies," which "lead [them] to remove, disfavor, or label various posts based on their content." *Moody*, 603 U.S. at 719-20. Other NetChoice member websites enforce similar policies. They restrict the publication of harmful speech, such as violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. *See, e.g.*, *id.* at 735 (discussing policies about "hate speech, violent or graphic content, child safety"). In addition, many covered websites promote positive and age-appropriate speech, such as content that encourages a healthy self-image.

**MINNESOTA HOUSE FILE 2**

54.     Effective July 1, 2026, Article 19, Section 13 of Minnesota House File 2 compels a content-based and vaguely defined collection of "social media platforms" to convey the government's prescribed message about highly controversial purported effects of social media use on users' mental health as if it were their own. Adding insult to injury, the Act prohibits websites from conveying their own message beside the one the State has dictated unless the State deems any counter-message sufficiently unobtrusive. And they must do so in the form of burdensome notifications to all users of any age every single time they access the service.

55.     **Content-based and vague central coverage definition of "social media platform." § 325M.31(j).** The Act targets a set of disfavored websites under its "social media platform" coverage definition, which defines the scope of covered websites and excludes many other websites from its burdens based on their "subject matter"—*i.e.*, their "content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563-64 (2011).

56.     Section 13 of the Act regulates "social media platform[s]." § 325M.31(j).

57.     The Act defines "social media platform" as any digital service that "allows an account holder to create, share, and view user-generated content for a substantial purpose of social interaction, sharing user-generated content, or personal networking." § 325M.31(j).

58.     "User-generated content" means "any content created by an account holder that is uploaded, posted, shared, or disseminated on the social media platform."

19

§ 325M.31(m). A "user" is "a natural person who is located in Minnesota and who holds an account or profile with a social media platform." § 325M.31(*l*).

59.     Among these "social media" websites, the Act only applies to websites that "(1) do[] business in Minnesota or provide[] products or services that are targeted to residents of Minnesota; and (2) ha[ve] more than 10,000 monthly active account holders located in Minnesota." § 325M.32(a).

60.     The Act further exempts a litany of entities and services from its compelled-speech requirements, often based on either content or speaker:

(1) an Internet search provider;
(2) an Internet service provider;
(3) an email service;
(4) a streaming service, online video game, e-commerce, or other Internet website where the content is not user generated but where interactive functions enable chat, comments, reviews, or other interactive functionality that is incidental to, directly related to, or dependent upon providing the content;
(5) a communication service, including text, audio, or video communication technology, provided by a business to the business's employees and clients for use in the course of business activities and not for public distribution, except that social media platform includes a communication service provided by a social media platform;
(6) an advertising network with the sole function of delivering commercial content;
(7) a telecommunications carrier, as defined in United States Code, title 47, section 153;
(8) a broadband service, as defined in section 116J.39, subdivision 1;
(9) single-purpose community groups for education or public safety;
(10) teleconferencing or video-conferencing services that allow reception and transmission of audio and video signals for real-time communication, except that social media platform includes teleconferencing or video-conferencing services provided by a social media platform;
(11) cloud computing services, which may include cloud storage and shared document collaboration;
(12) providing or obtaining technical support for a platform, product, or service; or
(13) a platform designed primarily and specifically for creative professional users, as distinct from the general public, to share their portfolio and creative content, engage in professional networking, acquire clients, and market the creative professional user's creative content and creative services through facilitated transactions.

§ 325M.31(j).

61. Through these exemptions, the Act singles out a subset of the "kinds" of "social media" websites discussed by the Supreme Court in *Moody* and *Packingham*—namely, websites that enable their users to view and engage in fully protected speech. *Moody* applied full First Amendment protection to websites that work in exactly this way: websites that apply their editorial policies while "allow[ing] users to upload content . . . to share with others" and allowing those "viewing the content . . . [to] react to it, comment on it, or share it themselves." 603 U.S. at 719.

62. The Act also excludes the "kinds of websites" beyond "social[]media" for which *Moody* questioned whether a different First Amendment editorial-discretion analysis might apply. *See id.* at 718, 724-25. The Act does this through both its definition of "social media platform" and its myriad exclusions.

63. The Act's exclusion of "e-commerce . . . websites," § 325M.31(j)(4), excludes "online marketplace[s] like Etsy" and "payment service[s] like Venmo," *Moody*, 603 U.S. at 725.

64. The Act's exclusion of websites where the "content is not user generated," § 325M.31(j)(4), excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725.

65. Accordingly, the Act's covered "actors" and "activities," *Moody*, 603 U.S. at 724, include the members and services identified above in ¶ 12.

66. Beyond these exclusions, the Act is vague about the boundaries of its reach. It does not define what it means for an account holder to engage with content "for a

substantial purpose of social interaction" or what it means for users to use a website for the purpose of creation, sharing, and viewing of user-generated content. § 325M.31(j).

67.     The Act likewise does not define what it means to exclude websites based on their "primar[y]" use or their "course" of use, § 325M.31(j)(13), or to exclude websites that provide "chat, comments, reviews or interactive functionality that is provided *incidental to*" certain online services. § 325M.31(j)(4) (emphasis added).

68.     **Compelled-speech warning. § 325M.335(1); DoH Guidelines.** Beginning on July 1, 2026, a "social media platform must ensure that a conspicuous mental health warning label . . . appears *each time* a user accesses the social media platform." § 325M.335(1)(a)(1) (emphasis added).

69.     These warning label requirements compel speech in a way that suggests the warnings come from the services themselves—when the warnings reflect only the opinion of the State. None of the State's compelled warnings attribute the content of the warnings to the State. And the statute's explicit prohibition on including extraneous information in the warning label that, in the State's view, obscures the visibility or prominence of the warning label precludes companies from disavowing that message.

70.     The label must "warn the user of potential negative mental health impacts of accessing the social media platform" and "provide the user access to resources to address [those] impacts and include the website and telephone number of a national suicide prevention and mental health crisis hotline." § 325M.335(1)(b).

71.     This warning label must persist until the user either "exits the social media platform" or "acknowledges the potential for harm and chooses to proceed . . . despite the

22

risk." § 325M.335(1)(a)(2). Users may *not* choose to disable the messages, no matter how many times they have seen them. § 325M.335(1)(c). A seventy-year-old professor who has clicked through the identical warning a thousand times must click through it again each time she accesses the website.

72.    The Act also gags the companies it conscripts from engaging in counter-speech if they disagree with the mandated content of the warning labels—or the requirement to engage in the speech in the first place—if it purportedly detracts from the visibility or prominence of the label. Under the Act, websites cannot provide "extraneous information in the warning label that obscures the visibility or prominence of the warning label." § 325M.335(1)(c).

73.    As required by the Act, Defendant Commissioner of Health "develop[ed] guidelines for social media platforms that contain appropriate requirements" for the mandated warning labels based on "current evidence regarding the negative mental health impacts of social media platforms." § 325M.335(2)(a); *see* DoH Guidelines ("This document fulfills Minnesota Statutes 2025, section 325M.335 MENTAL HEALTH WARNING LABEL . . . for mental health warning labels."). Those guidelines make the Act's constitutional problems worse, not better.

74.    The "Guidelines" issued by the State include four pages of warning labels that would ostensibly comply with the Act. Although the Act mandates only "*mental health warning label[s]*," § 325M.335(1)(a)(1) (emphasis added), the Guidelines include multiple categories of warnings under headings of: "mental health," "self-esteem," "sleep disruption," "safety concerns," "concerning content," "platform algorithms," "application

frequent notifications," and "infinite scrolling design," DoH Guidelines. And each warning label makes broad, hotly disputed assertions about the websites and the speech they provide.

75.    For example, the "mental health" label includes the following warnings:

- Warning: Social media use may negatively impact your mental health. Feeling anxious? Call/Text 988 or visit 988Lifeline.org

- Warning: What you see online can negatively affect your mental health. You are more than what is on social media. If you need help call/text 988 or visit 988Lifeline.org

- Feeling worse after scrolling? Call/Text 988 or visit 988Lifeline.org. Warning: Social media use may negatively impact your mental health.

*Id.*

76.    The Guidelines' other proposed warnings under other headings are even more contentious, and emphasize the content on the services:

- Warning: Some features are built to keep you coming back;

- Warning: Repeated exposure to upsetting content can negatively affect your mental health. Platforms often prioritize content that gets the most reactions;

- Warning: The app shows you posts based on what you liked and viewed, not necessarily what is balanced or accurate;

- Warning: The app shows what gets clicks, not what is true.

*Id.*

77.    Neither the Act nor the Guidelines explain which of the four pages of warnings—and how many of them—covered websites must parrot to their users. And none of them make it clear that the warnings are the State's message, and not the websites' messages.

24

78.     These guidelines were not issued with notice and comment, were not subject to the State's Administrative Procedure Act, and have the "force of law" despite not undergoing notice and comment. § 325M.335(2)(b); § 14.386(e).

79.     NetChoice and its members disagree with the content of these proposed warnings. But, at a minimum, the Act compels covered websites to speak the State's message on the highly controversial topic of "potential negative mental health impacts" of social media on users, which is the subject of intense scholarly and social debate, as well as active litigation. These are contested policy judgments dressed up as factual warnings and forced into the mouths of private speakers.

80.     Even the threshold question of what constitutes "social media" is unsettled, and the literature on its mental health effects is sharply contested. *See, e.g.*, Ferguson Decl., *NetChoice, LLC v. Bonta*, No. 5:22-cv-08861-BLF (N.D. Cal. Nov. 1, 2024), ECF 101-4.

81.     There is not sufficient "current evidence regarding the negative mental health impacts of social media platforms," as the term "social media platform" is defined by the Act. § 325M.335(2)(b). In other words, there is little to no evidence about the potential harms from use of the vast majority of websites that are compelled to make the State's warnings.

82.     There is not sufficient "current evidence regarding the negative mental health impacts of social media platforms," § 325M.335(2)(b), in the context of either minor or adult users.

25

83.     As the U.S. Surgeon General concluded, there are "[k]nown evidence gaps" regarding even *youth* social media use and mental health, to say nothing of that issue as to adults:

> The relationship between social media and youth mental health is complex and potentially bidirectional. . . . Most prior research to date has been correlational, focused on young adults or adults, and generated a range of results. Critical areas of research have been proposed to fill knowledge gaps and create evidence-based interventions, resources, and tools to support youth mental health. Thus, there is an urgent need for additional research.

U.S. Surgeon Gen., Advisory: Social Media and Youth Mental Health 11 (2023), https://perma.cc/A9MQ-KZWR.

84.     Likewise, the Surgeon General noted (as have many others) the potential "*benefits* of social media use among children and adolescents"—including facilitating (1) "positive community and connection with others who share identities, abilities, and interests"; (2) "access to important information"; (3) "a space for self-expression"; and (4) the opportunity to "form and maintain friendships online and develop social connections." *Id.* at 6. "[B]uffering effects against stress that online social support from peers may provide can be especially important for youth who are often marginalized, including racial, ethnic, and sexual and gender minorities." *Id.*

85.     Of course, covered websites cannot include such information, lest Defendants consider it "extraneous information in the warning label that obscures the visibility or prominence of the warning label." § 325M.335(1)(c).

86.     **Enforcement and penalties. § 325M.34.** The Minnesota Attorney General has the authority to "investigate and bring an action against a social media platform for an

alleged violation" of the Act. § 325M.34. The Act does not specify what relief the Attorney General may obtain in such an action.

## CLAIMS

87.     For its First Amendment claims, Plaintiff raises both (1) a facial challenge to Section 13 of the Act; and (2) a challenge to Section 13 "to the extent" it regulates the NetChoice covered members and services identified in ¶ 12. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

88.     The First Amendment facial-challenge inquiry is straightforward "from the face of the law" here because, "to the extent [the Act] offends the First Amendment, it does so in the same material way across all social media platforms subject to the provisions of the Act." *Weiser*, 808 F. Supp. 3d at 1232.

### COUNT I
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST
### THE STATES BY THE FOURTEENTH AMENDMENT
### (COMPELLED SPEECH)

89.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

90.     The Act's warning notification requirements, § 325M.335, violate the First Amendment.

91.     This challenge raises the rights of both NetChoice members and those who use or could prospectively use NetChoice members' websites.

27

92. As incorporated against the States by the Fourteenth Amendment, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I.

93. The freedom of speech protected by the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714; *see Moody*, 603 U.S. at 733; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988) (First Amendment protects against "compelled speech and compelled silence").

94. "[T]his general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573.

95. Likewise, it does not "matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative*, 600 U.S. at 586.

96. That is especially true here, where the Act's compelled-speech requirements both: (1) suggest that the warnings come from the websites themselves, when they actually are authored by, and reflect the opinions of, the State; and (2) would alter the "expressive product[s] that most reflects [covered websites'] views and priorities." *Moody*, 603 U.S. at 718.

97.     Much like Colorado's similar attempt to compel "social media" websites to publish warning labels, Section 13's compelled-speech warning requirements trigger and fail strict First Amendment scrutiny. *E.g.*, *Weiser*, 808 F. Supp. 3d at 1234-40.

98.     **Section 13's compelled-speech requirements trigger strict scrutiny for two independent reasons.** Section 13's compelled-speech warning notification requirements, § 325M.335(1), trigger strict scrutiny.

99.     *First*, compelled-speech requirements like the Act's compelled warnings trigger strict scrutiny. *E.g.*, *Weiser*, 808 F. Supp. 3d at 1234-40.

100.    "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech" and thus always triggers strict scrutiny. *Riley*, 487 U.S. at 795; *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citations omitted); *X Corp.*, 116 F.4th at 901-02; *Weiser*, 808 F. Supp. 3d at 1235.

101.    The Act compels speech from both websites *and* their users, as the label cannot disappear unless users exit the service or "*acknowledge*[] *the potential for harm*" identified in the warning label and "choose[] to proceed to the social media platform despite the risk." § 325M.335(1)(a)(2), (1)(b). And to make that message disappear, users must do so *every time* they want to access any covered website, no matter the user's age, maturity level, or how many times they have already seen the state-mandated warning. *Id.*

102.    *Second*, Section 13 also triggers strict scrutiny because its speech regulation depends on a content-based central coverage definition for "social media platform." § 325M.31(j); *Sorrell*, 564 U.S. at 566.

29

103. When a law's "coverage provision" "requires consideration of [websites'] content—that is, whether their content is 'predominantly or exclusively' socially interactive," that law is content based. *Murrill*, 812 F. Supp. 3d at 644-45 (citation modified).

104. Section 13's central coverage definition is content based because it draws lines based on the subject of the speech on a particular website.

105. For example, Section 13 *excludes* a host of websites based on the subject matter a particular website has chosen to display and disseminate, such as "single-purpose community groups for education or public safety" and networking websites for "creative professional users." § 325M.31(j); *see Yost*, 778 F. Supp. 3d at 951 (holding that exclusions for "news and current events" and "products offered for sale" were content based). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny); *see Sorrell*, 564 U.S. at 564 (similar); *Carr*, 789 F. Supp. 3d at 1219-21; *Yost*, 778 F. Supp. 3d at 954; *Reyes*, 748 F. Supp. 3d at 1123.

106. Similarly, the Act distinguishes user-generated content from other kinds of content. § 325M.31(j); *Paxton*, 747 F. Supp. 3d at 1038; *Griffin II*, 2025 WL 978607, at *9. It also distinguishes between websites that "allow[] an account holder to create, share, and view user-generated content for a substantial purpose of social interaction" and websites that foster other types of interaction (*e.g.*, business or commercial). § 325M.31(j); *see Reyes*, 748 F. Supp. 3d at 1122-23.

107. In addition, Section 13 triggers heightened First Amendment scrutiny because its central coverage definition is also speaker-based. Section 13 discriminates based

on *who* is disseminating speech, advantaging websites that have made the editorial choice to disseminate content that is not "user generated," § 325M.31(j)(4), while burdening similar websites that disseminate user-generated content.

108.   Because Section 13's central coverage definition is both content-based and speaker-based, Section 13's operative substantive requirements compelling speech relying on this definition are also content-based and speaker-based. *See Reyes*, 748 F. Supp. 3d at 1120.

109.   Section 13 does not compel commercial speech or information related to commercial speech. So Section 13 should be subject to strict scrutiny, and not intermediate First Amendment scrutiny.

110.   **The Act does not compel or regulate commercial speech.** The commercial-speech doctrine does not apply to this challenge of the Act's warning requirement because the Act's warning notification requirements are unrelated to any commercial transaction. *E.g.*, *Weiser*, 808 F. Supp. 3d at 1236-39.

111.   The compelled-speech warning requirements "do not constitute commercial speech because they do far more than merely propose a commercial transaction." *Id.* at 1236. In fact, "the disclosures compelled by the Act require social media companies to opine on the impacts of social media use on [users'] mental . . . health" and "such opinions . . . pertain to expressive issues of significant social, political, and scientific concern— and not matters of a commercial character." *Id.*

112.   "Speech is commercial when it does no more than propose a commercial transaction." *Bonta I*, 113 F.4th at 1119 (citation modified). The Eighth Circuit relies on

three factors when determining whether speech is commercial—(1) is it an advertisement, (2) does it refer to a specific product, or (3) is it motivated by an economic interest. *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)); *see Bonta I*, 113 F.4th at 1119 (Ninth Circuit applying similar factors); *Weiser*, 808 F. Supp. 3d at 1236-37 (similar).

113. Section 13's compelled-speech requirements do not regulate commercial advertisements.

114. Section 13 directly regulates the speech service itself that websites display and disseminate, even though it involves vast quantities of unquestionably protected, non-commercial speech.

115. Speech does not lose full First Amendment protection, or become "commercial" speech under the commercial-speech doctrine, just because the speech service is offered by a for-profit entity. That websites have an economic motivation for disseminating speech is "insufficient by itself" to turn the entirety of their expressive offerings into "commercial speech." *Bolger*, 463 U.S. at 67. Simply because speech is "published and sold for profit does not prevent [it] from being a form of expression whose liberty is safeguarded by the First Amendment." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952); *see Chiles*, 146 S. Ct. at 1025; *303 Creative*, 600 U.S. at 586.

116. Even if the compelled warnings were somehow construed as commercial speech, the State cannot force companies to engage in commercial speech if companies would not otherwise engage in commercial speech.

117. The Act's compelled-speech warning requirements do not require disclosures appended to commercial speech, such as the third-party-created commercial advertisements that the covered websites publish on their websites. *See Bonta I*, 113 F.4th at 1120. Rather, the Act's compelled-speech requirements force covered websites to engage in speech when they otherwise would not do so.

118. The Act's compelled-speech warning requirements do not refer to specific services. In fact, the disclosures do not concern any particular website or service at all. Instead, they require warnings about the impact of social media (as defined by the Act) *generally*, without reference to the alleged impact of the websites' *own* services.

119. The Act's compelled-speech warning requirements thus "do not have a clear economic motivation." *Id.*; *see X Corp.*, 116 F.4th at 901 (holding that state-mandated "Content Category Reports" were not commercial speech where the reports "require[d] a company to recast its content-moderation practices in language prescribed by the State").

120. Even if the Act's compelled-speech warning requirements could be construed to touch on commercial speech, they are "inextricably intertwined" with otherwise fully protected speech, so they are still subject to strict scrutiny. *See Riley*, 487 U.S. at 796. Covered websites disseminate "a staggering amount of" fully protected speech in their own "distinctive expressive offering[s]." *Moody*, 603 U.S. at 719, 711.

121. Even if the Act's compelled-speech warning requirements could be construed as regulating speech covered by the commercial-speech doctrine, they would still violate the First Amendment. Section 13 would fail commercial-speech intermediate scrutiny, because it does not "directly and materially advanc[e] the asserted governmental interest,"

and it is "more extensive than necessary to serve the interests that support it." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555-56 (2001) (citation omitted).

122. ***Zauderer* does not apply.** The standard of scrutiny articulated in *Zauderer v. Office of Disciplinary Counsel of Superior Court of Ohio* also does not apply here. 471 U.S. 626 (1985); *see Chiles*, 146 S. Ct. at 1022 ("laws that require speakers to disclose only factual, noncontroversial information *in commercial speech*" (emphasis added; citation modified) (citing *Zauderer*, 471 U.S. at 650-53)); *Weiser*, 808 F. Supp. 3d at 1239-40.

123. *Zauderer* review is limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010).

124. Section 13 does not regulate "advertisements." *Id.*

125. The Act's warning requirements are therefore not "reasonably related to the State's interest in preventing deception of consumers." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1062 (8th Cir. 2014) (quoting *Zauderer*, 471 U.S. at 651).

126. The Act's compelled-speech requirements do far more than simply mandate disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available." *NIFLA*, 585 U.S. at 768 (citation omitted); *see Zauderer*, 471 U.S. at 651; *X Corp.*, 116 F.4th at 900.

127. The compelled-speech warning requirements are highly controversial, because there is "robust disagreement by reputable scientific sources" and "scientific debate" on that issue—not to mention ongoing litigation. *Cal. Chamber of Com. v. Council for*

*Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022); *Jewell v. Herke*, 526 F. Supp. 3d 459, 468 (D. Minn. 2021) ("compelled advocacy regarding a controversial issue").

128.   Moreover, the warning requirements are designed to deter use of covered websites. Although "[r]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way . . . to stigmatize and shape behavior than for the government to have to convey its views itself, [] that makes [such a law] more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted).

129.   Deterring users is also "controversial" because it is "fundamentally at odds with" covered websites' missions to be open and available for users to access the wide range of protected speech available on their services. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1277-78 (9th Cir. 2023) (citation omitted).

130.   The warning notifications are not factual and are controversial for another reason: The literature on the impacts of social media is nascent and constantly changing. An issue is "controversial" where there is "robust disagreement by reputable scientific sources" and "scientific debate" on that issue. *See id.* (citation omitted). "[T]he truth of the statement[s]" about the impacts of social media are "subject to good-faith scientific or evidentiary dispute" and are an "integral part of a live, contentious political or moral debate" on social media use going on at all levels of policy making, cultural debates, and legal challenges throughout the country. *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024). Indeed, potential health effects on *adults* are perhaps even more controversial—and less developed—than social media's health effects on minors. And covered websites cannot be forced to speak the State's preferred message about minors either. *Weiser*,

35

808 F. Supp. 3d at 1234-40. Thus, the Act's requirement for covered websites to display warning notifications to both minor and adult users about "the impact of social media" is a controversial issue, still subject to significant debate with many open questions.

131.    **The Act's compelled-speech warning requirements fail strict scrutiny and any form of First Amendment scrutiny.** The Act cannot satisfy any form of heightened First Amendment scrutiny.

132.    Under strict scrutiny, Defendants must demonstrate that Minnesota has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Defendants cannot carry that burden.

133.    Minnesota lacks a sufficient governmental interest in forcing covered websites to deter their users from accessing protected speech, which is true for both minor and adult users. *E.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011).

134.    Minnesota lacks a sufficient interest in forcing covered websites to say the State's preferred message on ongoing, hotly contested, scientific and political debates about social media, especially when many private sources are already available to achieve the same ends.

135.    Minnesota lacks a sufficient interest in making covered websites present the State's opinion as the websites' own opinion, when the websites fundamentally disagree with the State's opinion.

136.    At any level of heightened First Amendment scrutiny, the Act's compelled-speech requirements are "unduly burdensome." *NIFLA*, 585 U.S. at 778. The

Act's compelled warnings threaten to "drown[] out" the speech that covered websites otherwise present to users. *Id.*; *see Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019) ("the contrasting rectangular border containing a warning that covers 20% of the advertisement [would] drown out Plaintiffs' messages" (citation modified)).

137.   The Act requires websites to display messages expressing the State's view on highly controversial and complicated research until the user either "exits the social media platform" or "acknowledges the potential for harm and chooses to proceed to the social media platform despite the risk." § 325M.335(1)(a)(2). This requirement substantially interferes with covered websites' dissemination of "curate[d] . . . feeds" that "combin[e] 'multifarious voices' to create a distinctive expressive offering." *Moody*, 603 U.S. at 711 (citation omitted).

138.   Under the First Amendment, Defendants have the burden to "specifically identify" how the Act addresses an "actual problem in need of solving" by government intervention. *Brown*, 564 U.S. at 799 (citation modified). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Id.* Here, Defendants must demonstrate that there is a problem that *requires* compelled speech—and that compelled speech is the least restrictive way to solve it.

139.   Defendants cannot satisfy their burden.

140.   To start, the Act's compelled-speech requirements are not the least restrictive means that the State could have used to address any legitimate concerns it may have about social media.

141.   Rather than compelling covered websites to display warning notifications, the Minnesota government could engage in its own governmental speech. *See* Minn. Dep't of Educ., Digital Literacy and Internet Safety (2025), https://perma.cc/SY9L-L7TP; Minn. Dep't of Health, THE MINNESOTA PARTNERSHIP FOR ADOLESCENT HEALTH: Safe and Secure Places to Live, Learn, and Play (June 17, 2025), https://perma.cc/55PX-3N3T. As other courts have already found with respect to similar laws, Minnesota "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, (2) educating children and parents on the importance of using such tools, and (3) relying on existing criminal laws that prohibit related unlawful conduct." *Bonta I*, 113 F.4th at 1121.

142.   Minnesota could also require schools and other government entities to provide digital literacy instruction about technology and social media use. *See, e.g.*, ExcelinEd, State Approaches to Digital Literacy Instruction (Feb. 2024), https://perma.cc/J7YV-RMWB.

143.   "To the extent that [users] are not aware of" this information, "notice . . . of their availability is a much less restrictive means of promoting the State's interest." *Griffin II*, 2025 WL 978607, at *14.

144.   Many covered websites include easily accessible information about safe and rewarding use of social media for users on their services and provide options for parents and their children to ensure that minors are safely and responsibly using their services. The

Supreme Court has endorsed similar "voluntary" efforts over governmental mandates. *Brown*, 564 U.S. at 803.

145.   Furthermore "the Act is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Yost*, 778 F. Supp. 3d at 957.

146.   The Act is overinclusive because it requires warning notifications for large swaths of valuable, protected, and entirely innocuous speech, without purporting to identify websites that are harmful. For example, it would require warning notifications to a retiree checking neighborhood updates on Nextdoor, a teacher sharing lesson plans on Pinterest, and a college student watching a cooking tutorial on YouTube.

147.   Research and history show that mandated disclosures are ineffective. Among other reasons, mandatory disclosures of information are ineffective because of what some scholars have called "the accumulation problem"—consumers today "confront so many disclosures daily and so many consequential disclosures yearly that they could not attend to (much less master) more than a few even if they wanted to." Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated Disclosure*, Harv. L. Sch. F. on Corp. Governance & Fin. Regul. (May 6, 2014), https://perma.cc/WE3T-V8W3. The Act does not explain or justify how the warning-notification requirements it imposes on covered websites will be any different.

148.   Even under the lower standard of intermediate scrutiny, the Act remains un-constitutional because it burdens substantially more speech than necessary, fails to directly advance a substantial governmental interest, and is improperly tailored.

149.    Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members and their users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and their users.

## COUNT II
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
## (RESTRICTION ON ACCESS)

150.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

151.    The Act's warning notification requirements, § 325M.335(1), violate the First Amendment by restricting every user's access to protected speech.

152.    This challenge raises the rights of both NetChoice members and those who use or could prospectively use NetChoice members' websites.

153.    The Supreme Court has recognized the right of social media users to "access" "social media" websites. *Packingham*, 582 U.S. at 107.

154.    Yet the Act's warning requirement impermissibly obstructs and suppresses access "to what for many are the principal sources for knowing current events . . . and otherwise exploring the vast realms of human thought and knowledge." *Id.*

155.    The Act erects an obstacle between users and vast amounts of fully protected speech based on the content of that speech. The Act would condition *every* user's access to content on social media websites, including billions of posts, on a user encountering from the get-go a state-mandated warning that users must "acknowledge" before "proceed[ing]" to the underlying speech, if they want the warning to disappear. *See* § 325M.335(1). This requirement applies identically to minors and adults, to every covered website, every time.

40

156.   Just as the government may not require a citizen to fill out a form before picking up a newspaper, it may not force a user to submit to a state-authored warning when accessing lawful speech online. *Cf. Lamont v. Postmaster Gen.*, 381 U.S. 301, 305 (1965).

157.   The Act's speech restrictions are subject to strict scrutiny for the reasons articulated in Count I.

158.   It fails strict scrutiny for all the reasons outlined above—and independently because there is no tradition of permitting the government to erect content-based obstacles to accessing speech that is lawful for all.

159.   Although States do have some latitude when regulating *minors'* access to speech that is *unprotected* as to them, *see Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 474 (2025), this Act is not limited to minors nor to unlawful speech. It applies to all users—both minor and adult—and all manner of fully protected speech.

160.   Even with respect to minor users, the State cannot restrict access to *protected* speech unless it satisfies strict scrutiny. "While it is true that 'a State possesses legitimate power to protect children from harm, that does not include a free-floating power to restrict the ideas to which children may be exposed.'" *Bonta I*, 113 F.4th at 1121 (citation modified) (quoting *Brown*, 564 U.S. at 794).

161.   Defendants have the burden to "specifically identify" how the Act addresses "an actual problem in need of solving." *Brown*, 564 U.S. at 799. Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Id.* (citation omitted). Here, Defendants must demonstrate that there is a problem in need of *governmental* solution, as compared to private solutions. It is not enough to identify a concern.

Defendants must show why the existing arsenal of private tools—parental controls, device-specific controls, network-specific controls, website-specific safety features, and digital-literacy programs (among others)—cannot do the job. Defendants cannot make that showing, because the private market is already at work.

162. Individuals and families have a wealth of choices to help oversee their activity online, and those choices provide more flexibility than the State's one-size-fits-all mandate. Defendants also cannot demonstrate why the Legislature ignored those viable alternatives.

163. And "[i]t is no response that voluntary," private options like those just described "may not go perfectly every time," because a "court should not assume a plausible, less restrictive alternative would be ineffective." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 824 (2000).

164. Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members and their users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and their users.

**COUNT III**
**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND**
**FOURTEENTH AMENDMENTS**

165. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

166. The Act is unconstitutionally vague, both in its definition of *who* must speak the State's preferred message and what those websites must—and *cannot*—say.

167.    The Act's central coverage definition, § 325M.31(j), is unconstitutionally vague, violating principles of due process and free speech.

168.    Because the definition determines *who must speak the State's message*, its vagueness directly threatens and chills First Amendment rights.

169.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). This standard is stricter where First Amendment interests are at stake. *See Fox Television Stations*, 567 U.S. at 253-54; *see District of Columbia v. City of St. Louis*, 795 F.2d 652, 653 (8th Cir. 1986).

170.    Here, many websites will lack notice of whether they are regulated by the Act at all. *E.g.*, *Murrill*, 812 F. Supp. 3d at 659-61.

171.    The Act's central coverage definition fails to provide necessary notice. The Act's central coverage definition and its exclusions use undefined and vague terms to determine which websites must comply with the Act's mandates. For example, the Act does not define "substantial purpose," "incidental to," "dependent upon," "course of business activities," or "primarily." § 325M.31(j).

172.    Take that first term: The Act does not define what it means for an account holder to engage with content "for a substantial purpose of social interaction." § 325M.31(j). It is difficult or impossible to banish only the "social" aspects of human

interaction, or to know where the line is between "social" and, say, "business" or "professional" interaction. Almost by definition, any medium that allows interaction of any kind allows social interaction, too. Thus, almost all websites that enable any kind of interaction among users could plausibly be covered by the Act if they meet the Act's other coverage requirements. A law that makes the exercise of First Amendment rights turn on a guess is not a law that provides fair notice.

173. Nor does the Act define what it means for users to use a website for the purpose of creation, sharing, and viewing of user-generated content. § 325M.31(j). The Act does not specify whose purpose—the user's, or the website's, or both—is pertinent.

174. The Act likewise does not define what it means to exclude websites based on their "primar[y]" use or their "course" of use. § 325M.31(j)(13); *see Griffin II*, 2025 WL 978607, at *15 (concluding coverage definition with similar language unconstitutionally vague). For example, many people use LinkedIn for "professional networking," § 325M.31(j)(13), but many others use it for varied interpersonal and "social" interaction. (The converse is also true: Many people use Instagram for "professional networking." § 325M.31(j)(13).) Whether LinkedIn is "primarily" a professional-networking site or a social-media platform is anyone's guess—and the Act provides no tools for answering the question. The same is true for countless other services that blend professional, educational, commercial, and social functions.

175. The Act also excludes certain websites that provide "chat, comments, reviews, or other interactive functionality that is *incidental to*" certain online services. § 325M.31(j)(4) (emphasis added). The phrase "incidental to" is vague. The Act provides

no standard for distinguishing "incidental" interactive features from non-incidental ones—leaving every website with a comment section to wonder whether it must speak the State's message.

176.    Many websites will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin II*, 2025 WL 978607, at *15. Therefore, "[c]ompanies must choose between risking unpredictable and arbitrary enforcement . . . and implementing the Act's . . . requirements. . . . Such ambiguity renders a law unconstitutional." *Id.* at *16; *Fox*, 567 U.S. at 253-54.

177.    The vague coverage definition is the threshold question upon which the entire Act depends: *who must speak* the State's message. Because a website cannot comply with a speech mandate without first knowing whether it applies, the vagueness of the coverage definition renders Section 13 invalid in its entirety.

178.    In addition, the Act's operative compelled-speech warning requirement is unconstitutionally vague, violating principles of free speech. § 325M.335.

179.    The State has issued four pages of proposed warning labels, yet it does not explain which warning labels websites must present—and how many. *See* DoH Guidelines.

180.    And it is not clear what other information covered websites can provide their users without violating the Act's prohibition on "extraneous information in the warning label that obscures the visibility or prominence of the warning label." § 325M.335(1)(b).

181. Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members of their fundamental rights and will irreparably harm Plaintiff and its members.

## COUNT IV
## EQUITABLE RELIEF

182. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

183. Section 13 of the Act, § 325M.335, violates federal law and deprives Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong*, 575 U.S. at 326; *Ex parte Young*, 209 U.S. 123 (1908).

184. This Court can and should exercise its equitable power to enter an injunction prohibiting Defendants from enforcing Section 13 of the Act against Plaintiff and its members.

## COUNT V
## 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
## DECLARATORY RELIEF

185. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

186. Article 19, Section 13 of the Act, § 325M.335, is unlawful and unenforceable because it violates the First Amendment to the Constitution and thereby deprives Plaintiff and its covered members of enforceable rights.

187. Article 19, Section 13 of the Act, § 325M.335, is also unlawful and unenforceable because it is unconstitutionally vague in violation of the First and Fourteenth

Amendments to the Constitution and thereby deprives Plaintiff and its covered members of enforceable rights.

188.    The unlawful portions of Article 19, Section 13 of the Act, § 325M.335, are not severable from the rest of that Section. The "valid portions of the statute," if any, "are 'essentially and inseparably connected with' the void provisions" and "the valid provisions," if any, "by themselves, are 'incomplete and . . . incapable of being executed in accordance with the legislative intent.'" *Loe v. Jett*, 796 F. Supp. 3d 541, 574 (D. Minn. 2025) (citing § 645.20). The compelled-warning requirements are Section 13's entire operative purpose; without them, nothing remains to sever. The entire Section is therefore unlawful and unenforceable.

189.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

190.    This Court can and should exercise its equitable power to enter a declaration that Article 19, Section 13 of the Act, § 325M.335, is unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

Plaintiff requests an order and judgment:

a. declaring that Minnesota House File 2 Article 19, Section 13 (2025), § 325M.335, is unlawful;

b. declaring that Minnesota House File 2 Article 19, Section 13 (2025), § 325M.335, violates the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment, both facially and as applied to Plaintiff's regulated members, including those identified in ¶ 12;

c. declaring that Minnesota House File 2 Article 19, Section 13 (2025), § 325M.335, is void for vagueness under the First and Fourteenth Amendments to the Constitution;

d. enjoining Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to enforce Article 19, Section 13 of Minnesota House File 2 (2025), § 325M.335, against Plaintiff's regulated members, including those identified in ¶ 12;

e. entering judgment in favor of Plaintiff;

f. awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

g. awarding Plaintiff all other such relief as the Court deems proper and just.

Dated: April 29, 2026                    Respectfully submitted,

*/s/ Aaron D. Van Oort*
FAEGRE DRINKER BIDDLE & REATH LLP
Aaron D. Van Oort (MN No. 315539)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
Email: aaron.vanoort@faegredrinker.com

*Attorney for Plaintiff NetChoice*