**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

NetChoice,

        Plaintiff,

v.

Keith Ellison, et al.,

        Defendants.

Case No. 26-cv-2405 (NEB/DTS)

**BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION**
**TO DISMISS**

_____

## INTRODUCTION

NetChoice, a trade association, represents social media giants who have repeatedly assured the public their platforms are safe even though they know better. If this sounds familiar, it should. Big tobacco promised—for decades—that smoking posed no health risks. Yet the tobacco industry knew those promises were empty. Social media platforms likewise know from internal studies that their products can be hazardous to users' health.

The parallels do not end there. At every turn, big tobacco invoked the First Amendment to challenge warning labels. Big tech has taken a page from that playbook to an extreme: social media companies say they cannot be regulated—full stop. They refuse to share data integral to better understanding the public health crisis that social media addiction poses and portends. And they claim not to comprehend what social media means.

In 2025, the Minnesota legislature passed a law that minimally regulates social media. It requires platforms to post a warning label users must acknowledge when they sign-in to their accounts. The warning label is commercial speech that furthers compelling

interests in ensuring Minnesotans receive accurate information about their well-being. NetChoice understands to whom the law applies. And NetChoice lacks standing to challenge the law on behalf of users, whose social media access is, at worst, incidentally burdened by the law. NetChoice's claims must be dismissed.

## FACTS

### A.    NetChoice Members' Public Positions on How Platforms Affect Mental Health.

For years, NetChoice's members have publicly disclaimed that their products negatively impact users' health. But they know that's not true. Begin with Meta CEO Mark Zuckerberg, who testified before the Senate Judiciary Committee in 2024:[1]

**Sen. Josh Hawley (R-MO):**

Thank you, Mr. Chairman. Mr. Zuckerberg, let me start with you. Did I just hear you say in your opening statement that there's no link between mental health and social media use?

**Mr. Zuckerberg:**

Senator. What I said is I think it's important to look at the science. I know people widely talk about this as if that is something that's already been proven and I think that the bulk of the scientific evidence does not support that.

**Sen. Josh Hawley (R-MO):**

Well, really, let me just remind you of some of the science from your own company. Instagram studied the effect of your platform on teenagers. Let me just read you some quotes from the Wall Street Journal's report on this. "Company researchers found that Instagram is harmful for a sizable percentage of teenagers, most notably teenage girls." Here's a quote from your own study: "We make body image issues worse for one in three teen girls." Here's another quote. "Teens blamed

---

[1] Big Tech and the Online Child Sexual Exploitation Crisis: Hearing Before the Senate Judiciary Committee, 119 Cong. (2024), https://perma.cc/N3WE-W9V7, at 2:18:55.

Instagram." This is your study for increases in the rate of anxiety and depression. This reaction was unprompted and consistent across all groups. That's your study.

**Mark Zukerberg:**

Senator. We try to understand the feedback and how people feel about the services. We can improve.

**Sen. Josh Hawley (R-MO):**

Wait a minute, your own study says that you make life worse for one in three teenage girls. You increase anxiety and depression. That's what it says. And you're here testify, testifying to us in public that there's no link. You've been doing this for years. For years you've been coming in public and testifying under oath that there's absolutely no link. Your product is wonderful. The science is nascent, full speed ahead, while internally you know full well that your product is a disaster for teenagers.[2]

In 2021, after the Wall Street Journal reported[3] on a trove of internal Instagram

documents—including a presentation entitled "Teens who struggle with mental health say

---

[2] A 2019 Meta study (codename "Project Mercury") found that "[p]eople who stopped using Facebook for a week reported lower feelings of depression, anxiety, loneliness, and social comparison." Meta killed the study, even though a staff researcher concluded it "does show causal impact" and another staffer warned that doing so would "look like tobacco companies doing research and knowing cigs were bad and then keeping that info to themselves[.]" Jeff Horwitz, *Meta buried 'causal' evidence of social media harm, US court filings allege*, Reuters (Nov. 24, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/meta-buried-causal-evidence-social-media-harm-us-court-filings-allege-2025-11-23/.

[3] Georgia Wells, Jeff Horwitz, & Deepa Seetharama, *Facebook Knows Instagram is Toxic for Teen Girls, Company Documents Show*, Wall St. J. (Sept. 14, 2021), https://www.wsj.com/tech/personal-tech/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-1631620739.

Instagram makes it worse"—Meta issued a statement stating that Instagram makes "difficult times ***better*** rather than worse" for teen girls.[4]

In a 2021 interview, YouTube's CEO described the Google-owned platform as "valuable" for teens' mental health.[5]  TikTok's CEO told Congress in 2023 that the "vast majority of [TikTok] users have a great experience."[6] And Discord recently touted the "powerful (and positive) relationship between online communities and mental health," downplaying "[d]iscussions of the relationship between online life and mental health" as "too simplistic[.]"[7]

**B.    The Legislature Studies How Social Media Affects Minnesotans' Well-Being.**

In 2023, the Minnesota legislature commissioned Attorney General Ellison to report on "the effect of new and emerging technologies on the well-being of Minnesotans." 2023 Minn. Laws, ch. 57, Art. 1, § 4, subd. 3. The findings were disturbing, including:

- Per internal Meta surveys, 28.3% of Instagram users reported witnessing bullying and harassment in a seven-day period, and 8.1% reported being a target of the same. Social media platforms facilitate cyberbullying by permitting anonymous users to contact others at scale and incentivizing comment thread participation.

- Another Meta survey showed 6.7% of Instagram users reported seeing self-harm content in the past seven days; that figure rose to 8.4% for users ages 13-15.

---

[4] Press Release, Meta, What Our Research Really Says About Teen Well-Being and Instagram (Sept. 26, 2021), https://perma.cc/C8P5-98TQ (emphasis original).

[5]  https://www.bloomberg.com/news/articles/2021-09-27/youtube-ceo-says-platform-is-valuable-for-teens-mental-health-ku30qkkd.

[6] TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms: Hearing Before the House Energy and Commerce Committee, 118 Cong. (Mar. 23, 2023), https://perma.cc/3CZJ-B2WK, beginning at 1:29:00 and 3:25:20.

[7] https://perma.cc/KH7U-VPV4.

- A study on regretted YouTube experiences found that most unwanted content was surfaced by recommendation algorithms rather than user choice. These algorithms are optimized for engagement and tend to promote a small group of relatively abusive users.

- An internal Meta study showed approximately 70% of teen girls reported seeing "too much" content that leads to negative appearance comparisons, which research has linked to increased risk of eating disorders.

- Academic investigations have highlighted how social media platforms facilitate, through monetization, the unwanted sexualization of users.

- Social media is designed to be—and is—addictive, which impacts school and sleep. Meta's internal research concluded, "when social media displaces sleep in adolescents, it is negatively correlated to indicators of mental health."

*See* Minn. Atty. Gen. Report on Emerging Tech. and Its Effects on Youth Wellbeing 8-10, 12-13 (Feb. 2024), https://perma.cc/R5MS-837L.

**C.    The Act's Piecemeal Approach to Protecting Minnesotans.**

Armed with data linking social media use to poor health outcomes, the legislature passed the Act in June 2025.[8] The Act is a restrained, piecemeal approach to regulating social media platforms, only requiring them to display "a conspicuous mental health warning label" when users sign in. Minn. Stat. § 325M.335, subd. 1.

The Act defines "social media platform," identifies what information the warning label must include, and tasks the Minnesota Department of Health (MDH) with developing its content. *Id.* subds. 1(b), 2(a).

---

[8] Act of June 9, 2025, ch. 3, Art. 19, § 13.

5

MDH's required language is as follows (hereinafter, "Warning Label"):[9]

> THE STATE OF MINNESOTA REQUIRES THIS MESSAGE: Some studies have shown that too much social media use is linked to increased mental health symptoms, including anxiety and depression, as well as harm to diet, sleep, and body image. If you need help, call or text 988 or visit 988Lifeline.org.

Legislative history confirms the Act was a direct response to the United States Surgeon General's call to action.[10] In a 2023 Advisory entitled "Social Media and Youth Mental Health," the Surgeon General, citing "broad agreement among the scientific community that social media has the potential to both benefit and harm children and adolescents[,]" urged swift "action to create safe and healthy digital environments that minimize harm and safeguard children's and adolescents' mental health and wellbeing during critical stages of development."[11] The Surgeon General warned that social media use "can harm children and adolescents by disrupting important healthy behaviors[,]" pointing to national surveys showing teens are addicted to social media and believe they are manipulated into overuse.[12] Policymakers were encouraged to develop standards for addressing excessive social media use"[13] The Surgeon General also noted "broad concern among the scientific community that a lack of access to data and lack of transparency from

---

[9] https://perma.cc/RQZ6-YD2D. MDH rescinded the prior iteration of the guidelines referenced in the Complaint.

[10] *See Commerce Finance and Policy Committee*, Minn. H.R. 1:17:26-1:20:00 (Mar. 20. 2025), https://perma.cc/3GCK-958U.

[11] Advisory 4-5, https://perma.cc/BV8Y-LJML.

[12] *Id.* 9-10.

[13] *Id.* 15.

technology companies have been barriers to understanding the full scope and scale of the impact of social media on mental health and well-being."[14]

Invoking the Surgeon General's entreaty, one of the Act's sponsors, Representative Zack Stephenson, likened social media to smoking: "we're going to look back at this time and social media companies the same way today we look back at big tobacco in the 50s and 60s."[15] Per Representative Stephenson, the Act's purpose is to "educate the public about the dangers of social media use," as "several studies have documented the direct link between excessive social media and poor mental health outcomes."[16] The legislature recognized the Act was one part of an incremental approach to protecting consumers. As Representative Stephenson put it:

> Warning labels are not the end all be all. It's not a complete solution. This is not a case where there is a silver bullet. We're going to need silver buckshot. We're going to need a lot of different, small solutions.[17]

**D.      Meta and Google Held Liable for Harming Users.**

Since the Act's enactment, two NetChoice members—Meta and Google—have been held liable for harming users. On March 24, 2026, a jury found Meta responsible for violating New Mexico's Unfair Practices Act by misleading the public about the safety of

---

[14] *Id.* 11.

[15] *See Commerce Finance and Policy Committee*, Minn. H.R. 1:17:26-1:20:00 (Mar. 20. 2025), https://perma.cc/3GCK-958U.

[16] *Id*.

[17] *Id*.

its platforms, assessing a $375 million civil penalty.[18] The next day, a California jury found Meta and Google responsible for the depression and anxiety of a woman who was addicted to their platforms as a child, awarding $6 million in damages.[19] Commenting on the verdict, Google denied that YouTube is social media.[20]

Minnesota and many other States are litigating consumer deception cases against NetChoice members.[21]

## E.   NetChoice's Allegations.

Against this backdrop, NetChoice claims the Act is unconstitutional in three ways. First, NetChoice says the Act violates the First Amendment because it compels its members and their users to speak. (Compl. ¶¶ 89-149.) Second, NetChoice alleges the act is unconstitutionally vague because its members cannot understand whether they are subject to the Act or what the Act requires. (*Id.* ¶¶ 165-181.). Third, NetChoice contends the Act violates the First Amendment because it restricts users' access to platforms. (*Id.* ¶¶ 150-164.)

NetChoice's legal claims are pinned to more of the same false promises that its members made to their users. (*Id.* ¶¶ 29-53.) Rather than acknowledging its members' role

---

[18] Bobby Allyn, *Jury finds Meta and Google negligent in social media harms trial*, NPR (Mar. 25, 2026), https://perma.cc/5R7G-6N3L.

[19] *Id.*

[20] https://perma.cc/9UXE-BKFS,

[21] *See, e.g., In re: Social Media Adolescent Addiction/Personal Injury Prods. Liability Litig.*, No. 4:22-MD-03047-YGR-PHK, MDL No. 3047 (N.D. Cal.); *State of Minnesota v. TikTok Inc.*, No. 27-CV-25-15301 (Hennepin Cnty. Dist. Ct.).

in this burgeoning public health crisis, NetChoice shifts the blame to parents and suggests that Minnesota can cure social media addiction through public education. (*Id.* ¶¶ 24-28, 36-52.)

## LEGAL STANDARD

Motions to dismiss for failure to state a claim require courts to determine whether a complaint plausibly establishes a pleader's entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In determining whether a complaint plausibly sets forth grounds for relief, courts must accept all factual allegations as true and consider these allegations in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Courts need not, however, accept as true legal conclusions couched as facts. *Id.*

## ARGUMENT

### I.   THE ACT LAWFULLY REGULATES COMMERCIAL SPEECH.

NetChoice first claims the Act compels expressive speech protected by the First Amendment. (Compl. ¶ 96.) Not so. The Act regulates commercial speech, which garners lesser constitutional protection, and the Warning Label is adequately tailored to Minnesota's compelling interests. No matter which level of commercial speech scrutiny applies, the Act is constitutional.

#### A.   The Warning Label is Commercial Speech.

The Act is a content-based regulation. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). Content-based speech regulations are often (but not always) subject to strict scrutiny—i.e., justified "only if the government proves that they are

narrowly tailored to serve compelling state interests." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 766 (2018).

Commercial speech is an exception. *See Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985) (rational basis scrutiny applies to laws compelling commercial disclosures); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980) (intermediate scrutiny applies to laws quelling commercial speech). In the broadest sense, commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.,* 533 U.S. 405, 409 (2001). This definition is "just a starting point," however. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021).

The Supreme Court uses three factors to identify commercial speech: (1) whether the speech is an advertisement, (2) whether the speech refers to a particular product, and (3) whether the speaker has an economic motivation. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983). None of these factors is dispositive and not all need be present for speech to be commercial. *Id.* at 67 n.14. District courts use common sense to distinguish between commercial and non-commercial speech. *Ariix*, 985 F.3d at 1115 ("[S]peech that does not propose a commercial transaction on its face can still be commercial speech.").

Precedent dictates that the Warning Label is commercial speech. *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). In *Moody*, the Supreme Court addressed laws that "restrict[ed] the ability of social media platforms to control whether and how third-party posts are presented to other users." *Id.* at 717. "[O]therwise put, the laws limit the platforms' ability to engage in content moderation[.]" *Id.* The Supreme Court treated those

10

laws as regulating commercial speech. *Id.* at 725-26; *see also id.* at 750-51 (Thomas, J., concurring in judgment); *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715, 1717-18 (2022) (Alito, J., dissenting from vacatur of stay).

The Second Circuit followed suit in *Volokh v. James*, concluding that "[a] neutral requirement that social media networks disclose their content moderation policies" is a commercial speech regulation. 148 F.4th 71, 89-91 (2d Cir. 2025). In reaching this conclusion, the court analogized to similar disclosure laws that affect traditional commercial speech, rejecting that social media is "different in kind" from other regulated products. *Id.* at 85-87, 91 (collecting cases); *see also X.AI LLC v. Bonta*, No. CV 25-12295 JGB (SSCx), 2026 WL 626926, at *6-7 (C.D. Cal. Mar. 4, 2026) (statute requiring generative AI developers to disclose summary of datasets and descriptions regulated commercial speech); *SEC v. Musk*, No. 25-105 (SLS), 2026 WL 279790, at *6 (D.D.C. Feb. 3, 2026) (collecting cases).

Common sense impels the same conclusion. While the Warning Label does not "propose a commercial transaction," it undoubtedly occurs "in the context" of one. *Bolger*, 463 U.S. at 66, 68; *see also Riley*, 487 U.S. at 796 (considering "the nature of the speech taken as a whole and the effect of the compelled statement thereon"). The crux of the relationship between social media platforms and users is commercial in nature. Consider Meta's "Terms of Service" which describes the "contract" between Meta and its users.[22] Meta uses "personal data, such as information about [users'] activity and interests, to show

---

[22] Meta, Terms of Service, ¶¶ 4.1, 4.2, https://perma.cc/89CC-EEGD.

[users] personalized ads and sponsored content[.]"[23] So too for YouTube.[24] X phrases the *quid pro quo* even more bluntly: "[i]n exchange for granting you access to and use of the [platform,] you agree that we and our third-party providers and partners may place advertising[.]"[25]

The Warning Label must appear each time a user initiates a new commercial transaction (i.e., signs in to their account) and relays information relevant to that transaction. *See Md. Shall Issue, Inc. v. Anne Arundel Cnty. Md.*, 91 F.4th 238, 242 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 152 (Oct. 7, 2024). *Maryland Shall Issue* is instructive. Gun dealers and a gun owners' organization challenged an ordinance requiring businesses that sold guns or ammunition to distribute a pamphlet addressing gun safety, suicide prevention, mental health, and related topics. *Id.* Because the pamphlet was displayed at the point of sale, the Fourth Circuit concluded, "it is facially apparent that the required disclosures are a safety advisory linked to the sales of guns and ammunition, which are commercial transactions." *Id.* at 248. Stated differently:

> [S]peech connected with the sale of a good or service—promoting the product or service, explaining it, or giving warnings about it—is commercial; it serves either the interest of the seller or assists customers and furthers the societal interest. Thus, while commercial speech includes speech proposing a commercial transaction, it also includes the advertising and promotion of products and services, assembly or user instructions, information about the product or service, disclaimers, and warnings on health and safety.

---

[23] *Id.* ¶ 2.

[24] *See* Google Privacy Policy, https://perma.cc/H3CR-8AV3.

[25] *See* X Terms of Service, https://perma.cc/LBW5-X3J9.

*Id.* (quotation omitted); *accord Ass'n of Home Appliance Mfrs. v. Weiser,* No. 1:25-cv-02417-SKC-KAS, 2025 WL 4642378, at \*5 (D. Colo. Dec. 19, 2025) (gas stove label requirement regulated commercial speech); *see also 1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1062-63 (8th Cir. 2014) (disclosures' "essential purpose" was "informing victims about the nature of services offered"); *X.AI LLC*, 2026 WL 626926, at \*6-7 (disclosure law regulated commercial speech because it provided users information they needed to decide whether to use a service); *DoorDash v. City of New York*, 798 F. Supp. 3d 337, 342, 354 (S.D.N.Y. 2025) (law requiring food delivery services to disclose customer information to restaurants regulated commercial speech, in part by empowering restaurants to make informed business decisions).

Indeed, beyond the world of big tech, caselaw treating product warnings as commercial speech is legion. *See Volokh*, 148 F.4th at 89-91 (collecting cases); *Home Appliance Mfrs.*, 2025 WL 4642378, at \*5 (same). To hit just a few more, a law requiring country-of-origin labels on meat products regulated commercial speech because it reflected "a congressional decision to empower consumers to take possible country-specific differences in safety practices into account." *Am. Meat Inst. v. U.S. Dep't of Ag.*, 760 F.3d 18, 21-25 (D.C. Cir. 2014). Likewise, a law intended to promote consumer decision-making that required restaurants to post calorie content information on menus regulated commercial speech. *N.Y. State Rest. Ass'n. v. N.Y. City Bd. of Health*, 556 F.3d 114, 131-34 (2d Cir. 2009). And tobacco health warnings focused on "raising consumer awareness" are commercial speech. *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 875-77 (5th Cir. 2024); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 492 & n.1 (1995) (commercial

speech includes "warning labels on cigarettes," "labeling requirements for food products," "labeling requirements for drug products," and securities "registration statement[s]") (Stevens, J., concurring).

The commercial speech doctrine thus applies to products and services alike. None of these traditional labels and warnings propose a commercial transaction. Rather, they compel speech at the moment of a commercial transaction that matters most: the point of sale. Social media is a product, and platforms cash in every time someone logs in. The Warning Label is but a modern iteration of the same commercial speech that courts have recognized for decades.

### B.    The Warning Label Satisfies Rational Basis Review.

*Zauderer*'s rational-basis standard applies to disclosure mandates like the Warning Label. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-50 (2010). Under *Zauderer*, a law regulating commercial speech is constitutional when it is: (1) "purely factual and uncontroversial"; (2) "reasonably related" to government interests; and (3) not "unduly burdensome." 471 U.S. at 651. The Warning Label meets all these requirements.

#### 1.    The Warning Label is purely factual.

Neither the Supreme Court nor the Eighth Circuit has defined what "purely factual" means. *R.J. Reynolds*, 96 F.4th at 878. The closest the Supreme Court has come is "the distinction between a statement of fact that expresses certainty about a thing, and a statement of opinion . . . that does not." *Id.* (cleaned up and quotation omitted); *see also Milavetz*, 559 U.S. at 249 ("the disclosures entail only an accurate statement"); *cf. Planned*

14

*Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 742 (8th Cir. 2008) (noting "constitutionally significant difference between . . . neutral information and subjective idea") (Murphy, J., dissenting).

NetChoice cannot dispute that the Warning Label is purely factual. It is "composed only of (a) information supported by facts and (b) conclusions driven by those facts"; it is "not akin to unfalsifiable statement of opinion." *R.J. Reynolds*, 96 F.4th at 878. Myriad studies, some referenced above, show that excessive social media use is linked to the outcomes the Warning Label addresses. *See id.* at 879 ("Consequences supported by scientific findings, even if exaggerated or non-modal, are still, by definition, factual."); *see also Md. Shall Issue*, 91 F.4th at 249-50 (statements in pamphlets, including that gun access increases suicide risk, held purely factual).

### 2. The Warning Label is uncontroversial.

As the Surgeon General noted in 2023, "[m]ore research is needed to fully understand the impact of social media" on mental health.[26] True, studies have not definitively proven a causal relationship between social media use and negative health outcomes. That is unsurprising. Social media companies have "been barriers to understanding the full scope and scale of the impact of social media on mental health and well-being."[27] And if Project Mercury is any indication, they bury internal studies that reveal inconvenient truths. Still, "the current body of evidence" includes "ample indicators

---

[26] Advisory 4.

[27] *Id.* 11.

that social media can [ ] have a profound risk of harm to mental health and well-being[,]" and "[t]here is broad agreement among the scientific community that social media has the potential" to cause harm."[28]

This correlative relationship is no secret—social media platforms' internal research openly acknowledges it.[29] That is all the Warning Label ("some studies have shown") communicates. While the causal link between social media and negative health outcomes may be controversial, their correlation is not—and that distinction satisfies *Zauderer*. *See Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 662 F. Supp. 3d 557, 580-81 (D. Md. 2023) (upholding constitutionality of pamphlets where correlational relationship was indisputable and "the pamphlets do not suggest a causal relationship"); *aff'd*, 91 F.4th at 249-52 (observing that pamphlets suggested correlation between gun access and suicide, not that firearms cause suicide); *see also Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 629-30 (D. Vt. 2015) (cataloging cases concluding that compelled commercial speech must be "opinion-based" to be "controversial"). As well, that social media is a hot-button topic does not render the Warning Label controversial. *See NIFLA*, 585 U.S. at 776 ("[W]e do not question the legality of health and safety warnings long considered permissible[.]"); *accord CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) (commercial speech is not controversial simply because it "can be tied in some way to a controversial issue"); *see also Bolger*, 463 U.S. at 67-68 (communications can "constitute

---

[28] *Id.* 4-5.

[29] *See also NetChoice v. Griffin*, 2026 WL 1068565, at *3 (W.D. Ark. Apr. 20, 2026) (cataloging deleterious effects of social media use that are "hard to deny").

commercial speech notwithstanding the fact that they contain discussions of important public issues").

### 3.    The Warning Label reasonably relates to Minnesota's interests.

Because the Warning Label is purely factual and uncontroversial, Defendants need only demonstrate that it is reasonably related to government interests. *Zauderer*, 471 U.S. at 651. While government interests peak when combatting misleading commercial speech, *Zauderer* applies even without consumer deception. *Milavetz*, 559 U.S. at 249; *Am. Meat Inst.*, 760 F.3d at 321-27; *accord R.J. Reynolds*, 96 F.4th at 882 ("The First, Second, Sixth, and Ninth Circuits have also taken this approach."); *Safelite Grp., Inc. v. Rothman*, 229 F. Supp. 3d 859, 886 (D. Minn. 2017).

Defendants make this showing, on the pleadings. The State has a compelling interest in protecting its citizens' health and well-being. *See Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 341 (1986) (reducing demand for casino gambling in order to prevent harmful effects on health, safety, and welfare of citizens is a substantial interest). Likewise, the State has an equally strong interest in preventing Minnesotans from being misled. *Zauderer*, 471 U.S. at 651.

The Warning Label reasonably serves both interests. Despite scientific consensus that excessive social media use correlates to negative health outcomes, NetChoice's members have actively rejected *any* such correlation, repeatedly insisting there is nothing to see and burying data demonstrating otherwise. An average Minnesotan could easily be misled—by these statements and others—to believe that social media use poses no risk to their well-being. This potential for deception suffices under *Zauderer*. *See 1-800-411-Pain*,

17

744 F.3d at 1061-62 (no requirement to show actual deception when potential is self-evident); *Safelite Grp.*, 229 F. Supp. 3d at 887 (*Zauderer*'s reasonable relation "standard is relatively forgiving"); *see also N.Y. State Rest. Ass'n*, 556 F.3d at 134-35 (reasonable relationship between point-of-sale calorie disclosure requirement and state interests in reducing consumer deception and promoting informed decision making to combat obesity epidemic). The Warning Label is aimed at providing accurate information and goes no further than necessary to effectuate the State's interests.

### 4.    The Warning Label is not unduly burdensome.

NetChoice contends the Act is unduly burdensome, relying on *NIFLA* and *American. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749 (9th Cir. 2019). (Compl. ¶ 136.)  Both are distinguishable.

In *NIFLA*, the Supreme Court concluded that a law mandating pregnancy centers to disseminate notice stating they were unlicensed stood to "drown[ ] out" the centers' "own message." 585 U.S. at 778. The law: (1) applied to all print and digital advertising materials; (2) required pregnancy centers to "call attention to the notice" using "some method such as larger text or contrasting type or color"; and (3) directed that the notice be posted "in as many as 13 different languages." *Id.* Given these constraints, a center's hypothetical billboard urging "Choose Life" would be overwhelmed by the message California compelled. *Id.*

The Ninth Circuit reached the same conclusion in *American Beverage*, about San Francisco's requirement that sugar-sweetened beverage advertisements contain a warning set off with a rectangular border that occupied at least 20% of the advertisement space. 916

F.3d at 753-57. Of significance, San Francisco's own expert opined that a warning half the size would suffice. *Id.* at 757. On that basis, the law was deemed unduly burdensome. *Id.*

In contrast, neither the Act nor MDH guidance specifies the Warning Label's font size, type, or color, bordering, or how much space the Warning Label must occupy. Minn. Stat. § 325M.335, subd. 1. Those decisions are left to social media platforms. *Id.* And platforms may include their own "extraneous information" in the Warning Label so long as it does not obscure the Warning Label's "visibility or prominence[.]" *Id.* It necessarily follows that the Warning Label is not unduly burdensome. *See CTIA*, 925 F.3d at 848-49 (distinguishing *American Beverage* where ordinance imposed a "minimal requirement" of a single posted notice or handout "to which the retailer may add additional information"); *R.J. Reynolds*, 96 F.4th at 886 (warnings posed no risk that tobacco companies "would have no reason to speak at all"); *Nat'l Retail Fed. v. James*, 806 F. Supp. 3d 427, 442-43 (S.D.N.Y. 2025) (one-sentence disclosure "in any font or format" did not unduly burden trade association members' speech).

Nor does the Act unduly burden users.[30] The Warning Label disappears if the user merely acknowledges it. Minn. Stat. § 325M.335, subd. 1(a)(2). And it remains commercial speech as to users. *Free Speech Coal. v. Paxton*, 606 U.S. 461, 483 (2025) ("[A]dults have no First Amendment right to avoid age verification[.]"). At most, the Act incidentally burdens users' expressive activity. *Id.* at 486-87 (describing age verification as a "modest burden"); *Ark. Times LP v. Waldrip as Tr. of Univ. of Ark. Bd. of Trs.*, 37 F.4th 1386, 1394

---

[30] As explained below, NetChoice lacks standing to pursue relief on users' behalf.

(8th Cir. 2022) (requirement that government contractors sign certification held incidental); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."). *Zauderer* applies and defeats NetChoice's compelled speech claim.

### C.    The Warning Label Also Satisfies Intermediate Scrutiny.

Even if the Act did not combat misleading speech, the result is the same. "[R]estrictions on nonmisleading commercial speech regarding lawful activity must withstand intermediate scrutiny—that is, they must 'directly advance[]' a substantial government interest and be 'n[o] more extensive than necessary to serve that interest.'" *Milavetz*, 559 U.S. at 249 (alterations original) (quoting *Cent. Hudson*, 447 U.S. at 566).

A law is "adequately tailored" to advance a substantial government interest "so long as the government's interest would be achieved less effectively absent the regulation and the regulation does not burden substantially more speech than is necessary to further that interest." *Free Speech Coal.*, 461 U.S. at 496 (quotation omitted). This "requires a reasonable fit between the legislature's ends and the means chosen to accomplish those ends[.]" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 557 (2001). The Court need not agree with the efficacy of this "fit," nor must it be the most effective or least restrictive means of achieving the legislature's objectives. *Free Speech Coal.*, 606 U.S. at 496-97; *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). Further, to satisfy intermediate scrutiny, Defendants need not prove that the Warning Label is empirically justified but may rely on "studies and anecdotes . . . history, consensus, and 'simple common sense.'" *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995). Thus, lawmakers

may regulate commercial speech on an incremental basis without offending the First Amendment. *Zauderer*, 471 U.S. at 651 n.14; *United States v. Edge Broad.,* 509 U.S. 418, 434 (1993)  (state need not "make progress on every front before it can make progress on any front").

The Act directly advances the State's *compelling* interest in protecting the health and well-being of Minnesotans from the negative correlates of excessive social media use. *See Posadas*, 478 U.S. at 341; *accord Rubin*, 514 U.S. at 484-85 (substantial interest in preventing "greater alcoholism and its attendant social costs"). And it is adequately tailored, imposing only a "minimal requirement" on platforms, and (at worst) a "modest burden" on users. *CTIA*, 925 F.3d at 848-49; *Free Speech Coal.*, 606 U.S. at 486-87. Regardless of whether rational-basis or intermediate scrutiny applies, the Act is a constitutional regulation of commercial speech.

## II.   NETCHOICE'S VAGUENESS CHALLENGE FAILS.

NetChoice next alleges that the Act is unconstitutionally vague, first as to whom it regulates and second as to what that regulation requires. (Compl. ¶ 166.) As for the "what," MDH's revised Warning Label eliminates any ambiguity and moots NetChoice's challenge to the now-rescinded version. *See McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1034-36 (8th Cir. 2004). So, Defendants focus only on the "whom."

Social media is not a novel concept. *See Moody*, 603 U.S. at 715-16 (describing social media platforms as having gone from "unheard-of to inescapable"). Yet NetChoice, a trade association that specializes in all things internet, says the Act's definition of "social

21

media platform" is unconstitutionally difficult to understand. This argument strains credulity, fails for lack of standing, and has no merit.

### A.     NetChoice Lacks Standing to Advance Its Vagueness Claims.

When a litigant challenges a law for vagueness, the statute must be "unconstitutional as applied to [the litigant's] specific conduct at issue." *Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013). Exceptions to this rule apply for overbreadth claims, but the overbreadth doctrine does not apply to commercial speech, and only commercial speech is implicated here. *See Garner v. White*, 726 F.2d 1274, 1277 (8th Cir. 1984).

Absent these exceptions, NetChoice cannot establish standing because it lacks any ability to mount an as-applied challenge. The Complaint shows that NetChoice understands how the Act applies to its members. "Based on the Act's central coverage definition," NetChoice alleges, the following of its members are covered by the statutory definition of "social media platform": Automatic, Discord, Meta, Nextdoor, Pinterest, Reddit, Snap Inc., TikTok Inc. and TikTok USDS Joint Venture LLC, X, and YouTube. (Compl. ¶ 12.) NetChoice's allegations also establish that it understands how to apply the Act's definitional exclusions. It states, for instance, that online payment platforms like Venmo are excluded, as are online marketplaces like Etsy and rideshare services like Uber. (*Id.* ¶¶ 62-64.) Beyond these allegations, NetChoice offers only conclusory assertions about the Act's alleged vagueness, claiming that "many websites will lack notice of whether they are regulated by the Act" without specifying any. (*Id.* ¶ 170.)

Even a cursory review of NetChoice's allegations shows that the Act is clear enough to be analyzed with respect to other NetChoice members not referenced in the complaint.

22

For example, the complaint does not allege whether the Act covers car- and rideshare platforms like Turo and Waymo.[31] But NetChoice's concession that it understands the Act to exclude Uber is good enough to conclude that it should know whether the Act covers Turo and Waymo. So too for Amazon, Hims & Hers, OfferUp, StubHub, and Wing[32] (online marketplaces); as well as JPMorganChase and PayPal[33] (online finance and payment platforms). NetChoice's concession that it understands the Act to exclude online marketplaces and payment services similarly proves that NetChoice should know whether the Act applies to this latter litany of its members. Because the complaint does not identify any particular NetChoice member as to whom the Act is unconstitutionally vague—and in fact forecloses NetChoice from alleging as much—NetChoice lacks standing to advance its vagueness claim.

## B.     No Heightened Standard Applies to NetChoice's Vagueness Challenge.

If the Court concludes that NetChoice has standing to advance its vagueness claim, then it should not require any heightened specificity from the Act. "The degree of vagueness tolerated by the Constitution depends on the nature of the enactment as well as potential penalties." *Iowa Safe Schs. v. Reynolds*, 172 F.4th 589, 596 (8th Cir. 2026). Due process requires less specificity when a statute does not impose criminal penalties. *Id*.

---

[31] https://perma.cc/EEZ5-Y7NS ("Turo . . . provides an online car sharing platform . . . ."); https://perma.cc/FA7X-JAK6 (Waymo is a "fully autonomous ride-hailing service.").

[32] *See, e.g.*, https://perma.cc/4XG2-NATE (OfferUp's services include "posting items," "buying and selling," and "posting jobs."); https://perma.cc/T4MX-YDY5 (StubHub is "the leading marketplace for fans to buy and sell tickets.").

[33] https://perma.cc/BJ93-WSCH ("All PayPal accounts let you do things like: [s]end and receive money" and "[b]uy things online.").

23

Statutes that impose only economic regulation are subject to a "less strict vagueness test," in part because businesses "can be expected to consult relevant legislation" and may avail themselves of opportunities to clarify its meaning. *Assoc. Builders*, 155 F.4th at 1021-22. To be sure, courts require a "proportionately greater degree of specificity" when a law implicates the First Amendment. *Iowa Safe Schs.*, 172 F.4th at 596; *NetChoice v. Murrill*, 812 F. Supp. 3d 594, 659 (M.D. La. 2025). But here, the Act only reaches commercial speech. Thus, no commensurate increase in specificity is required.

### C.    The Act Fairly Defines "Social Media Platform."

NetChoice asserts that the Act's central coverage definition "fails to provide necessary notice." (Compl. ¶ 171.) While NetChoice concedes the Act defines "social media platform," it alleges the definition is nevertheless unconstitutionally vague because it does not contain subdefinitions for certain terms. (*Id.*) NetChoice identifies five terms within the statutory definition that it believes are unconstitutionally vague:

- "substantial purpose"
- "incidental to"
- "dependent upon"
- "course of business activities"; and
- "primarily"

(*Id.*)

Laws must give "fair notice" of what is forbidden or required. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A statute is not void for vagueness "simply because it may be ambiguous or open to two constructions." *Mumad v. Garland*, 11 F.4th

24

834, 838 (8th Cir. 2021). Courts likewise will not indulge "hypertechnical theories" as to what a statute might cover. *Hill v. Colorado*, 530 U.S. 703, 733 (2000). Only when a statute does not give people of ordinary intelligence a "reasonable opportunity" to understand its terms is its language unconstitutionally vague. *Assoc. Builders*, 155 F.4th at 1021. Lawmakers are, after all, "condemned to the use of words," and thus need not achieve "mathematical certainty." *Iowa Safe Schs.*, 172 F.4th at 597. When it is clear what the law "as a whole" requires, a vagueness challenge will be rejected. *Id.* at 596.

In addition, Legislatures need not define every term in a statute. *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019) (words are given their ordinary meaning in absence of statutory definition). When analyzing statutory language for vagueness, "context is all important." *Am. Comms. Ass'n, CIO v. Douds*, 339 U.S. 382, 412 (1950); *see also Mumad*, 11 F.4th at 839-40 ("textual limits" prevented unconstitutional vagueness); *NetChoice v. Bonta*, 152 F.4th 1002, 1023 (9th Cir. 2025) (non-circular definitions ameliorated vagueness concerns).

The Act fairly identifies what counts as a social media platform. It includes a statutory definition that helps websites entities understand what counts through an affirmative definition and clarifying exclusions. Minn. Stat. § 325M.31(j). While comprehensive, this language is free from certain hallmarks of vagueness, such as circular definitions. *See Bonta*, 152 F.4th at 1023 (rejecting vagueness challenge to prohibition against "addictive" algorithms when statute defined "addictive feed" and "addictive internet-based service" without "circularly rely[ing] on the word 'addictive'" or its

25

synonyms). NetChoice has fair notice and sufficient clarity as to what the Act "as a whole" purports to regulate. *Iowa Safe Schs.*, 172 F.4th at 596.

Nor are any of the five terms that NetChoice identifies unconstitutionally vague. Each term—by its plain meaning and context—reasonably apprises NetChoice of the Act's scope. NetChoice would have this Court dissect the Act's definition word-by-word, and each of those words word-by-word as well. But that approach inappropriately shears the statute's language from its context, contrary to the Supreme Court's instruction in *Doud*, 339 U.S. at 412. It would also require the Court to indulge in precisely the sort of "hypertechnical theories" of application that are off limits. *Hill*, 530 U.S. at 733. If the Court nevertheless examines the Act's individual words as closely as NetChoice urges, the challenged terms quickly reveal themselves to be plain and understandable.

**Substantial purpose.** NetChoice says it does not understand what it means to engage with content for a "substantial purpose of social interaction." (Compl. ¶ 172.) Because virtually all interactions can be construed to have a social aspect, NetChoice asserts, "any medium that allows interaction of any kind allows social interactions," such that "almost all websites that enable any kind of interaction . . . could plausibly be covered by the Act." (*Id.*) NetChoice's "main problem with the phrase appears to be with 'substantial.'" *Johnson v. John Deere Co.*, 935 F.2d 151, 156 (8th Cir. 1991). *See* (Compl. ¶ 172 ("It is difficult or impossible . . . to know where the line is between 'social' and [other types of] interaction.")).[34]

---

[34] People of ordinary intelligence understand what social interactions are.

This assertion is unavailing. The term "substantial" is found "throughout the law and is clearly within the understanding of the ordinary person." *John Deere Co.,* 935 F.2d at 156 (concluding "substantial contributing cause" is not unconstitutionally vague). Courts routinely apply legal standards that employ this word, from "substantial evidence" to a "substantial likelihood of success on the merits." *See also, e.g.*, *United States v. Carpenter,* 422 F.3d 738, 746 (8th Cir. 2005) ("substantial risk of harm to human life"); *United States v. Washam,* 312 F.3d 926, 930-31 (8th Cir. 2002) ("substantially similar"); *Moore v. Clarke*, 904 F.2d 1226, 1234 (8th Cir. 1990) ( "substantial history of serious assaultive or terrorizing criminal history"); *Adam & Eve*, 933 F.3d at 958-59 (rejecting vagueness challenge to "principal business purpose" even though statute did not quantify what counts as "principal"). NetChoice's own complaint belies any fair likelihood it could find this term vague. It expressly invokes and relies on that term to argue that the Act does not survive First Amendment scrutiny because it "fails to advance a *substantial* government interest." (Compl. ¶ 148 (emphasis added).) If NetChoice expects to argue about "substantial government interests," then surely it can fairly determine a website's "substantial purpose."

Moreover, by using the term "substantial," the Act provides a standard that guides enforcement by limiting its coverage definition to only certain websites and not all websites with "any" social purpose. The Act is therefore like the adult bookstore ordinance that survived a vagueness challenge in *ILQ Invs., Inc. v. City of Rochester*, 25 F.3d 1413 (8th Cir. 1994). In that case, the ordinance definition of covered bookstores was challenged as unconstitutionally vague. *Id.* at 1418 (defining covered bookstores as those with a "substantial or significant portion" of sexually explicit merchandise). The Eighth Circuit

27

described the definition's use of "substantial" as "limiting" and observed that this word appears frequently in federal statutes. *Id.* at 1419; *see also Iowa Safe Schs.*, 172 F.4th at 597 (declining to require "mathematical certainty" in statutes). So too here. Rather than NetChoice's freewheeling hypothetical, the Act limits its coverage to only certain websites—those that allow accounts to be created for purposes that are sufficiently social in nature to qualify as substantial.

**Incidental to; Dependent upon.** NetChoice next claims the term "incidental to" is vague because the Act provides "no standard for distinguishing 'incidental' interactive features from 'non-incidental' ones." (Compl. ¶ 175.) The Act's plain language cures any confusion. By using the term "incidental," the Act meant what that word means— "[s]ubordinate to something of greater importance; having a minor role." *Incidental*, *Black's Law Dictionary* (12th ed. 2024); *see Adam & Eve*, 933 F.3d at 958 (giving statutory language its ordinary meaning on vagueness challenge). Thus, the Act's definitional exclusion in section 325M.31(j)(4) refers to websites with chats, reviews, and other interactive features that are "subordinate to" the website's main content.

An easy example of this is an e-commerce website, like Amazon. Its website includes user reviews so customers can share their experience with the products they purchase, but those reviews are plainly "incidental to" Amazon's primary content—the product pages. Reviews would lack purpose if presented without any information about the product being reviewed, and are thus subordinate, while a product could still be sold in the absence of reviews. In contrast, NetChoice's hypothetical about "every website with a comment section" would require this Court to address every conceivable edge case of the

28

Act's application, a standard of clarity that goes beyond the Constitution's demands. *See Farkas v. Miller*, 151 F.3d 900, 906 (8th Cir. 1998) ("It will always be true that the fertile legal imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question." (quotation omitted, alteration original)). For the same reasons the term "incidental to" is not vague, neither is the term "dependent upon."

**Course of business activities.** NetChoice does not appear to raise any specific reasons why it finds the phrase "course of business activities" vague. Presumably, it believes that this phrase is vague because many websites are businesses that treat their platforms as products and users as customers. By this logic, any website that offers a platform for users might fall under the Act.

The context of this phrase resolves this quandary. Subsection (j)(5) exempts from the Act a communication service that is "provided by a business to the business's employees and clients *for use in the course of business activities and not for public distribution*." Minn. Stat. § 325M.31(j)(5) (emphasis added). While "course of business activities" might be ambiguous on its own, its context signals internal, non-public business uses of communication services. A fair interpretation of this might be workplace tools like Zoom or Teams. At worst, any ambiguity merely portends the possibility of "close cases" in applying the Act but does not render the language unconstitutionally vague. *See Bonta*, 125 F.4th at 1023 (citing *United States v. Williams,* 553 U.S. 285, 305-06 (2008)). "Close cases can be imagined under virtually any statute," but what renders a statute vague is "indeterminacy" and "wholly subjective judgments." *Williams*, 553 U.S. at 306. Courts and litigants alike can determine whether a communication service is provided for use "in

29

the course of business activities," so the Act is not indeterminate or wholly subjective, and thus not unconstitutionally vague.

**Primarily.** NetChoice says it does not understand how to apply the definitional exclusion for websites that are designed "primarily" for certain purposes, such as professional networking. (Compl. ¶ 174 (citing Minn. Stat. § 325M.31(j)(13).) It uses LinkedIn as an example, arguing that while many people use that website for "professional networking," others use it for "interpersonal and 'social' interaction." (*Id.*)

This argument fails on fact and law. As to fact, one glance at LinkedIn's website is enough to resolve any confusion. LinkedIn mission "is simple: connect the world's professionals. . . ."[35] Caselaw points in the same direction. NetChoice cites *Griffin*, but the statute at issue in that case, an age-verification law, imposed criminal penalties and implicated protected speech. 2025 WL 978607, at *15-16. The statute here does neither. Nor is any of the alleged statutory ambiguity at issue in *Griffin* present here. In that case, the court could not determine what perspective to use when analyzing the word "primary," questioning "whose 'primary purpose' is being considered—the user in creating the account or the company in making the forum available." *Id.* Here, there is no such ambiguity. The Act uses "primarily" in an adverbial phrase that describes the type of user engagement for which a platform is designed. Minn. Stat. § 325M.31(j)(13). Because "primarily" is part of a phrase that modifies the verb "designed," it orients the reader to the

---

[35] https://perma.cc/4MW8-MBPZ.

platform's perspective rather than leaving the reader to choose between a user's perspective or that of a platform.

Returning to the example of LinkedIn, the Act does not care whether someone uses LinkedIn for interpersonal engagement. It only cares whether LinkedIn was "designed primarily and specifically" for users to engage in certain creative and professional conduct. *See, e.g.*, *United States v. Posters N Things Ltd.*, 969 F.2d 652 (8th Cir. 1992) (rejecting vagueness challenge to statute that criminalized items "primarily intended or designed" for use with illegal drugs). People of reasonable intelligence can assess whether a website satisfies this exclusion by considering the purpose for which it was designed. The Act is therefore not vague based on its use of the term "primarily."

### III. NETCHOICE LACKS STANDING TO SUE ON BEHALF OF USERS, WHOSE ACCESS TO PLATFORMS IS MINIMALLY IMPACTED BY THE ACT.

Finally, NetChoice claims the Act will infringe the First Amendment rights of Minnesotans to access its members' websites. NetChoice has no standing to assert these users' rights, but even if it did, the Act only incidentally restricts users' access and satisfies intermediate scrutiny.

#### A.   NetChoice Cannot Establish Third-Party Standing.

"[A] plaintiff may [generally] only assert his own injury in fact and 'cannot rest his claim to relief on the legal rights or interests of third parties.'" *Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Courts third-party standing only in "limit[ed]" circumstances. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *see Hodak*, 535 F.3d at 904 (explaining that third-party standing is

31

a limited exception). A party may assert third-party standing (or prudential standing) if it can show: (1) an "injury in fact," (2) "a close relation to the third party," and (3) "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see Christian Lab. Assoc. v. City of Duluth,* 142 F.4th 1107, 1114 (8th Cir. 2025) (noting that "when plaintiffs 'fail[ ] to establish [prudential] standing' for First Amendment claims, it is because they are asserting someone else's right to speak . . . not their own") (citation omitted).[36]

NetChoice has not established Article III standing because NetChoice has not identified a particular and concrete harm faced by its members, and therefore it cannot bring a claim on behalf of its members' users. NetChoice must show that it, as the party seeking "to assert the rights of another[,]" has constitutional standing. *Kowalsk*i, 543 U.S. at 129-30. To establish standing, an organization must demonstrate that it suffered or will suffer an injury in fact that is imminent and not hypothetical. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 559-61 (1992). It must show a "concrete and demonstrable injury to [its] activities which drains its resources and is more than simply a setback to its abstract social

---

[36] "An exception to this prudential standing requirement is overbreadth. *Advantage Media, LLC v. City of Eden Prairie*, 405 F. Supp. 2d 1037, 1042 (D. Minn. 2005). A plaintiff can proceed under the overbreadth doctrine and raise the rights of third parties if it "can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Id*. (quoting *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)). This exception does not apply here because NetChoice has not established "that the third-party activities it seeks to protect are 'at the heart' of its own injury-in-fact or consistent with its own First Amendment interests." *Id*. at 1044 (denying commercial advertiser's third-party claim). Nor is there any punishment under the Act for social media users that would warrant standing for NetChoice under this exception. *Munson,* 467 U.S. at 956. In any event, the overbreadth doctrine does not apply to commercial speech. *See Advantage Media*, 405 F. Supp. 2d at 1042.

interests." *Nat'l Fed'n. of the Blind v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999). An organization cannot establish standing without stating "specific facts establishing distinct and palpable injuries." *Id.* Allegations of a possible future injury are insufficient to confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

NetChoice has not identified a concrete, particularized, and imminent harm. NetChoice has not shown a credible threat that the Act could be enforced to prevent its members from engaging in protected speech, so any claimed injury is hypothetical and will not satisfy the injury-in-fact requirement. *See Clapper*, 568 U.S. at 409-12; *Phillips v. DeWine,* 841 F.3d 405, 417 (6th Cir. 2016) (finding "allegation of a subjective chill . . . insufficient to satisfy Article III."); *Christian Labor Assoc.*, 142 F.4th at 1114 (finding labor organization lacked standing because its members did not have standing). Accordingly, NetChoice has not pled sufficient facts to establish Article III standing.

NetChoice also has not shown that it, or its members, have a close relationship to the users whose First Amendment rights it seeks to champion. NetChoice, in fact, has failed to show it has any relationship with the users, not to mention a close one. *Cf. Kowalski,* 543 U.S. at 130-31 (noting close relationships, like the attorney-client relationship, can be sufficient for third party standing). NetChoice is a trade association of social media websites that promotes the interests of its members. (Compl. ¶ 10.) NetChoice has not established that it has such a "close relationship" with the users "comparable to the paradigmatic close relationships that other courts have traditionally found as an adequate basis for third-party standing." *See Democracy N.C. v. N.C. State Bd. of Elecs.*, 476 F.

Supp. 3d 158 (M.D.N.C. 2020) (noting such close relationships include doctor-patient relationship).

Moreover, NetChoice has not established that any of its own members have a close relationship with their users. A close relationship is necessary because the interests of NetChoice's members are often contrary to their users, as many parents, for instance, would like warning labels for their children on social media websites, as would some adults. *See Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) (rejecting third-party standing due to "potential divergence between the interests" of plaintiff and potential third parties). The relationship between social media websites and their users is often incompatible. *See Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 15 (2004) (refusing "prudential standing" where parent's interests could conflict with his child's interests); *see, e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1087 (9th Cir. 2021) (parents alleged that Snapchat inspired their children to drive at dangerous speeds and caused their deaths). These conflicts of interest should prevent NetChoice's bid for third-party standing on behalf of its members' users.

NetChoice has also not demonstrated that there are any hindrances to users protecting their own interests. "[A] party must show that some barrier or practical obstacle prevents or deters the third party from asserting his or her own interest." *Hodak*, 535 F.3d at 904 (citation omitted). Users in Minnesota can challenge the Act's warning requirement on their own if they wish. *See Kowalski*, 543 U.S. at 130; *see also City of L.A. Police Dep't v. United Reporting Publ'g Co.*, 528 U.S. 32, 39 (1999) (denying First Amendment claim when challenged regulation did not prohibit a speaker from conveying information).

34

Indeed, users have challenged regulations of online platforms. *See e.g.*, *Alario v. Knudsen*, 704 F. Supp. 3d 1061, 1068, 1070 (D. Mont. 2023) (lawsuit by TikTok users to prevent implementation of a social-media regulation); *U.S. WeChat Users All. v. Trump,* 488 F. Supp. 3d 912, 916-17 (N.D. Cal. 2020) (messaging app users' lawsuit challenging an executive order). Minnesotan social media users face no barriers to protecting their own interests so the Court should not permit NetChoice to bring suit on their behalf.

Because NetChoice lacks standing as an organization, its third-party claim fails. NetChoice's claim on behalf of users must also fail because NetChoice has not shown that it has a close relationship with them or that they are hindered in any way from bringing their own claims.

### B.        The Act Incidentally Restricts Users' Access to Platforms.

NetChoice's restricted-access claim independently fails because, at most, the Act only incidentally restricts users' access to platforms. As to users, the Act is content neutral because it "does not restrict any *type* of speech, simply the *form* in which that speech is presented." *Comput. & Commc'ns Indus. Ass'n v. Uthmeier,* No. 25-11881, 2025 WL 3458571, at \*5 (11th Cir. Nov. 25, 2025) (emphasis original). In *Uthmeier*, the Eleventh Circuit held that a law prohibiting youth under 14 from creating social media accounts and requiring parental consent for 14- and 15-year-old users was content neutral because it was agnostic to the topics of users' speech and was justified by government interests unrelated to the content of speech on platforms. *Id.* at \*1, 5; *see also Hill*, 530 U.S. at 703 (finding regulation that "does not clearly prohibit . . . either a particular viewpoint or any subject matter that may be discussed by a speaker" content neutral); *TikTok v. Garland*, 604 U.S.

56, 72-73 (2025) (law banning social media companies controlled by foreign adversaries was content neutral because its "rationale is decidedly content agnostic"). Thus, the law incidentally restricted speech and satisfied intermediate scrutiny. *Uthmeier*, 2025 WL 3458571, at \*6; *see also Free Speech Coal.*, 606 U.S. at 478, 496-98 (age verification law incidentally burdened adults' access to speech on website and survived intermediate scrutiny).

The Act does not restricts users' access to or expressive activity on social media platforms. *Cf. Free Speech Coal.*, 606 U.S. at 483 (no First Amendment right to avoid age verification). It just requires users to acknowledge the Warning Label upon signing in to their accounts—a "modest burden" akin to viewing health advisories when opening a pack of cigarettes. *Id.* at 486-87. And as explained above, the Act furthers Minnesota's compelling interests, is adequately tailored to the same, and thus passes intermediate scrutiny. The First Amendment requires no more.

## CONCLUSION

"We can improve," Mark Zuckerberg vouched in 2024. Two years on, nothing has. This past March, the University of Oxford released a report finding that social media is harming health *at the global population-level*.[37] The time to act is now.

---

[37] Johathan Haidt & Zachary Rausch, *Social media is harming adolescents at a scale large enough to cause changes at the population level*, World Happiness Report 2026, https://perma.cc/6B5M-4UNH.

The Warning Label is no panacea. But it's a small step in the right direction—and strikes the correct constitutional balance between the State, social media platforms, and Minnesotans. To conclude otherwise would mean that big tech really is unregulatable.

Dated:  June 3, 2026

KEITH ELLISON
Attorney General
State of Minnesota

s/ Jeff Timmerman
Jeff Timmerman
Atty. Reg. No. 0352561
Madeleine DeMueles
Atty. Reg. No. 0402648
Lindsay K. Strauss
Atty. Reg. No. 0395688
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, MN 55101-2131
(651) 583-7660 (Timmerman)
jeffrey.timmerman@ag.state.mn.us
madeleine.demueles@ag.state.mn.us
lindsay.strauss@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS