**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MINNESOTA**

| | |
|---|---|
| NETCHOICE,<br><br>*Plaintiff*,<br><br>v.<br><br>KEITH ELLISON, in his official capacity as Attorney General of Minnesota; and<br>DR. BROOKE CUNNINGHAM, in her official capacity as Commissioner of Minnesota Department of Health,<br><br>*Defendants*. | Civil Action No. 0:26-cv-02405-NEB-DTS |

**PLAINTIFF NETCHOICE'S OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## Table of Authorities

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)................................................................................. 10, 18

*1-800-411-Pain Referral Serv., LLC v. Otto*,
    744 F.3d 1045 (8th Cir. 2014) ................................................................. 24, 25

*Adams v. U.S. Bancorp*,
    635 F. Supp. 3d 742 (D. Minn. 2022) ............................................................. 9

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
    916 F.3d 749 (9th Cir. 2019) ......................................................................... 36

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
    760 F.3d 18 (D.C. Cir. 2014) ................................................................... 23, 28

*Ariix, LLC v. NutriSearch Corp.*,
    985 F.3d 1107 (9th Cir. 2021) ....................................................................... 18

*Ashcroft v. FSC*,
    535 U.S. 234 (2002)....................................................................................... 42

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................... 9

*Ass'n of Home Appliance Mfrs. v. Weiser*,
    826 F. Supp. 3d 1302 (D. Colo. 2025)........................................................... 22

*Baggett v. Bullitt*,
    377 U.S. 360 (1964)....................................................................................... 37

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    591 U.S. 610 (2020)....................................................................................... 12

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983)......................................................................................... 18

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) .......................................................................... 26

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)............................................................... 31, 32, 34, 35, 42

*Burson v. Freeman*,
　　504 U.S. 191 (1992)..................................................................................................35

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
　　29 F.4th 468 (9th Cir. 2022) ...............................................................................25, 27

*Chiles v. Salazar*,
　　146 S. Ct. 1010 (2026) ...............................................................................................9

*Cincinnati v. Discovery Network*,
　　507 U.S. 410 (1993) .............................................................................................14, 16

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
　　747 F. Supp. 3d 1011 (W.D. Tex. 2024)....................................................................13

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
　　No. 24-50721, 2026 WL 2130729 (5th Cir. July 24, 2026) ..........................................1

*Craig v. Boren*,
　　429 U.S. 190 (1976)............................................................................................43, 44

*DoorDash, Inc. v. City of New York*,
　　789 F. Supp. 3d 337 (S.D.N.Y. 2025)........................................................................22

*Ent. Software Ass'n v. Blagojevich*,
　　469 F.3d 641 (7th Cir. 2006) .....................................................................................29

*Erznoznik v. City of Jacksonville*,
　　422 U.S. 205 (1975)..................................................................................................31

*FCC v. Fox Television Stations, Inc.*,
　　567 U.S. 239 (2012)..................................................................................................37

*FEC v. Cruz*,
　　596 U.S. 289 (2022)..................................................................................................31

*Fla. Bar v. Went for It, Inc.*,
　　515 U.S. 618 (1995)..................................................................................................35

*Free Speech Coal., Inc. v. Paxton*,
　　606 U.S. 461 (2025)..................................................................................2, 11, 35, 44

*Free Speech Coal., Inc. v. Paxton*,
　　95 F.4th 263 (5th Cir. 2024) .................................................................................25, 29

*Heartland Acad. Cmty. Church v. Waddle*,
427 F.3d 525 (8th Cir. 2005) ...................................................................... 41

*Henderson v. Springfield R-12 Sch. Dist.*,
163 F.4th 478 (8th Cir. 2025) ..................................................................... 41

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ..................................................................................... 42

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ............................................................................... 10, 19

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018) ..................................................................................... 10

*Jewell v. Herke*,
526 F. Supp. 3d 459 (D. Minn. 2021) ................................................... 24, 26

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) ..................................................................................... 11

*June Med. Servs. v. Russo*,
591 U.S. 299 (2020) ............................................................................... 43, 44

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ..................................................................................... 43

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) ......................................................................... 30, 31, 33

*Maryland Shall Issue, Inc. v. Anne Arundel Cnty.*,
91 F.4th 238 (4th Cir. 2024) ....................................................................... 22

*McCullen v. Coakley*,
573 U.S. 464 (2014) ............................................................................... 32, 42

*McDonough v. Anoka Cnty.*,
799 F.3d 931 (8th Cir. 2015) ........................................................................ 9

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ..................................................................................... 19

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010) ..................................................................................... 24

iii

*Minn. Right to Life v. Rashid*,
No. 25-CV-02476 (NEB/DTS), ECF 47 (D. Minn. Oct. 20, 2025)............................ 31

*Mo. Broads. Ass'n v. Lacy*,
846 F.3d 295 (8th Cir. 2017) .................................................................................. 9

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).................................................... 1, 4, 10, 16, 19, 20, 36

*Mox v. Olson*,
No. 23-CV-3543, 2024 WL 3526913 (D. Minn. July 24, 2024) ........................... 30, 32

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*,
556 F.3d 114 (2d Cir. 2009)....................................................................... 23

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)................................................................................. 39

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) .................................................................. 31

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) ................................................................... 29

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)....................................... 3, 11, 13, 18, 24, 25, 30, 32, 36

*NetChoice v. Carr*,
789 F. Supp. 3d 1200 (N.D. Ga. 2025) ....................................................... 2

*NetChoice v. Griffin*,
812 F. Supp. 3d 905 (W.D. Ark. 2025)........................................................ 2

*NetChoice v. Griffin*,
No. 5:25-cv-5140 (TLB), 2026 WL 1068565 (W.D. Ark. Apr. 20, 2026)................... 1

*NetChoice v. Hilgers*,
No. 4:26-cv-03149, 2026 WL 1850018 (D. Neb. June 27, 2026) ................................ 1

*NetChoice v. Jones*,
822 F. Supp. 3d 656 (E.D. Va. 2026) ...................................................... 2, 36

*NetChoice v. Murrill*,
812 F. Supp. 3d 594 (M.D. La. 2025).............................................. 2, 12, 17, 38, 39

*NetChoice v. Weiser*,
808 F. Supp. 3d 1223 (D. Colo. 2025)...............2, 10, 11, 12, 14, 15, 16, 19, 24, 32, 33

*NetChoice, L.L.C. v. Fitch*,
134 F.4th 799 (5th Cir. 2025) ....................................................................... 41

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .......................................... 2, 10, 16, 17, 32

*NetChoice, LLC v. Griffin*,
No. 5:23-cv-5105 (TLB), 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ......... 2, 38, 39

*NetChoice, LLC v. Paxton*,
142 S. Ct. 1715 (2022)................................................................................ 20

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024)....................................................... 2, 13

*NetChoice, LLC v. Yost*,
2026 WL 1758907 (6th Cir. June 18, 2026) ............................................... 35

*Packingham v. North Carolina*,
582 U.S. 98 (2017)............................................................................. 1, 3, 33

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*,
83 F.4th 658 (8th Cir. 2023) ...................................................................... 37

*Porous Media Corp. v. Pall Corp.*,
173 F.3d 1109 (8th Cir. 1999) .................................................. 14, 15, 17, 18

*In re R.M.J.*,
455 U.S. 191 (1982)................................................................................... 24

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)............................................................................. 11, 12

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)............................................................................. 11, 16

*SEC v. Musk*,
826 F. Supp. 3d 35 (D.D.C. 2026) .............................................................. 23

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984)............................................................................. 42, 43

v

*In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*,
No. 4:23-cv-05448-YGR, 2026 WL 1892681 (N.D. Cal. June 29, 2026)..................28

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ............................................................................. 12, 36

*Stuart v. Camnitz*,
774 F.3d 238 (4th Cir. 2014) ................................................................. 28

*Students Engaged in Advancing Texas v. Paxton*,
177 F.4th 665 (5th Cir. 2026) ................................................................ 23

*U.S. v. Williams*,
553 U.S. 285 (2008) .............................................................................. 37

*United States v. Playboy Ent.*,
529 U.S. 803 (2000) ......................................................................... 32, 43

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001) ......................................................................... 14, 24

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) .............................................................................. 42

*Van Buren v. United States*,
593 U.S. 374 (2021) .............................................................................. 15

*Video Software Dealers Ass'n v. Schwarzenegger*,
556 F.3d 950 (9th Cir. 2009) ................................................................ 29

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) .............................................................................. 43

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025) ....................................................... 20, 21, 22

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ............................................................................... 2

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .............................................................................. 33

*Wooley v. Maynard*,
430 U.S. 705 (1977) .......................................................................... 2, 10

vi

*X Corp. v. Bonta*,
　　116 F.4th 888 (9th Cir. 2024) ...................................................................... 2, 10, 17

*X.AI LLC v. Bonta*,
　　No. CV 25-12295 JGB (SSCx), 2026 WL 626926 (C.D. Cal. Mar. 4,
　　2026) ...................................................................................................................... 23

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
　　471 U.S. 626 (1985) ................................................................... 13, 14, 20, 24, 25

**Statutes**

Minn. Stat. § 14.386 ................................................................................................ 8, 40

Minn. Stat. § 325M.31 ................................................... 3, 6, 7, 12, 13, 34, 37, 38

Minn. Stat. § 325M.32 ................................................................................... 6, 34, 36

Minn. Stat. § 325M.34 ......................................................................................... 8

Minn. Stat. § 325M.335 ............................................ 1, 3, 4, 7, 8, 12, 16, 26, 36, 37, 40

N.Y. Gen. Bus. Law § 394-ccc ................................................................................ 21

**Other Authorities**

Minn. Dep't of Educ., Digital Literacy and Internet Safety (2025),
　　https://perma.cc/54AS-DCWH ............................................................................ 5

Minn. Dep't of Health, THE MINNESOTA PARTNERSHIP FOR
　　ADOLESCENT HEALTH: Safe and Secure Places to Live, Learn, and
　　Play (June 17, 2025), https://perma.cc/9SQS-N7MD ........................................ 5

Minn. Dep't of Health, Minnesota Social Media Mental Health Warning
　　Label Guidelines (June 1, 2026), https://perma.cc/ML5R-H9YX ...................... 8

Nat'l Acads. of Scis., Eng'g & Med., Social Media and Adolescent Health
　　(2024), https://perma.cc/YNR7-AQGU .............................................................. 26

Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated
　　Disclosure*, Harvard L. Sch. F. on Corp. Governance (May 6, 2014),
　　https://perma.cc/YYL4-FKXD ............................................................................ 35

U.S. Surgeon Gen., Advisory: Social Media and Youth Mental Health
　　(2023), https://perma.cc/A9MQ-KZWR .......................................................... 5, 27

**Table of Contents**

Introduction ........................................................................................................... 1

Background............................................................................................................ 4

    A. Statement of allegations .......................................................................... 4

        1. NetChoice members' websites disseminate and enable large amounts of fully protected speech................................................................ 4

        2. The merits of social media are the subject of significant debate, and ample private resources exist to provide users with information about social media use and to assist parents with overseeing their minor children's internet use. ......................................................................... 4

    B. Minnesota HF2 Article 19, Section 13 .................................................. 6

Standard ................................................................................................................ 9

Argument .............................................................................................................. 9

    I. NetChoice has plausibly stated a claim that the Act's compelled-speech requirements violate the First Amendment. ........................................... 9

    A. The First Amendment prohibits compelled-speech mandates like the Act's compelled warnings. ..................................................................... 9

    B. The Act's warning-notification requirements trigger strict First Amendment scrutiny—and not commercial-speech scrutiny—for two independent reasons........................................................................................ 11

        1. The Act's requirements trigger strict scrutiny as compelled speech........... 11

        2. The Act's central coverage definition is content-based, which independently triggers strict scrutiny. ......................................... 12

    C. Contrary to Defendants' arguments, the Act does not regulate or compel commercial speech and thus *Zauderer*'s standard of review does not apply. ... 13

        1. Defendants have not demonstrated that the speech at issue is commercial speech under the Eighth Circuit's multi-factor test................. 14

        2. The speech at issue is not commercial under other binding or persuasive precedent................................................................. 19

        3. *Zauderer*'s standard of review for purely factual and uncontroversial disclosures in commercial advertising does not apply to the Act's controversial compelled-speech requirements. ........................................... 23

D. The Act's warning-notification requirement fails strict scrutiny or any other form of heightened First Amendment scrutiny. ................................................. 30

    1. Minnesota lacks a sufficient governmental interest in compelling covered websites to disseminate controversial speech. .............................. 30

    2. The Act's warning notification is not properly tailored. ........................... 32

II. The Act is unconstitutionally vague in key respects. ........................................... 37

III. NetChoice has standing for all claims and this Court can and should consider users' First Amendment rights in assessing NetChoice's First Amendment claims. ................................................................................................................ 41

Conclusion ................................................................................................................ 45

**Introduction**

Out of the many ways Minnesota could have chosen to address its concerns about social media use, it decided to force private parties to parrot the State's talking points. This approach violates the Constitution. Plaintiff NetChoice has adequately pleaded a claim for relief in its First Amended Complaint ("complaint"). The Court should therefore deny the motion to dismiss.

In Article 19, Section 13 of Minnesota House File 2 (2025) ("Act"), the State commands a subset of social media services—selected by the content of their speech—to "conspicuous[ly]" display the State's contested warning that the speech they publish is "linked to . . . anxiety and depression, as well as harm to diet, sleep and body image." § 325M.335(a); *see infra* p.8.[1] Minnesota commands platforms to display this warning to every user (adults and minors, alike) every time the user accesses their service, no matter how many times the user has already seen it. The warning must also remain visible until the user either exits the service or "acknowledges the potential for harm and chooses to proceed . . . despite the risk." § 325M.335(1)(a)(1)-(2).

The Supreme Court and numerous district courts have held unconstitutional laws interfering with access to—and the dissemination of content on—such services.[2]

---

[1] This Motion interchangeably uses "websites," "services," and "platforms" to refer to regulated "social media platforms." Unless otherwise noted, statutory citations refer to the Minnesota Revised Statutes.

[2] *See Moody v. NetChoice, LLC*, 603 U.S. 707 (2024); *Packingham v. North Carolina*, 582 U.S. 98 (2017); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, No. 24-50721, 2026 WL 2130729 (5th Cir. July 24, 2026); *NetChoice v. Hilgers*, No. 4:26-cv-03149, 2026 WL 1850018 (D. Neb. June 27, 2026); *NetChoice v. Griffin*, No. 5:25-cv-5140 (TLB),

Particularly relevant here, courts have invalidated other laws compelling those platforms

to deliver the State's message—including Colorado's analogous social media warning la-

bel law. *NetChoice v. Weiser*, 808 F. Supp. 3d 1223 (D. Colo. 2025); *see NetChoice, LLC*

*v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) ("*Bonta I*"); *X Corp. v. Bonta*, 116 F.4th 888 (9th

Cir. 2024). This law is unconstitutional, too. So NetChoice's claims survive both Rule 12's

liberal standard and Defendants' mistaken attempts to characterize the Act as a

run-of-the-mill regulation of purely commercial speech.

First, the Act flouts the one "fixed star in our constitutional constellation," *W. Va.*

*State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), by conscripting private social

media services to act as mouthpieces for the State, thus violating their First Amendment

right to "refrain from speaking," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The First

Amendment does not permit the government to order warning labels for websites any more

than it does for movies, books, songs, or podcasts.

Defendants concede that the "Act is a content-based regulation" of speech and that

such regulations are generally subject to strict scrutiny. ECF 27 at 9 (Defs.Mem.). The Act

cannot survive strict scrutiny—a standard that "is fatal in fact absent truly extraordinary

circumstances." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 485 (2025) ("*FSC*").

Certainly, the State cannot show at the pleading stage that the regulations "are narrowly

---

2026 WL 1068565 (W.D. Ark. Apr. 20, 2026); *NetChoice v. Jones*, 822 F. Supp. 3d 656
(E.D. Va. 2026); *NetChoice v. Murrill*, 812 F. Supp. 3d 594 (M.D. La. 2025); *NetChoice*
*v. Griffin*, 812 F. Supp. 3d 905 (W.D. Ark. 2025); *NetChoice v. Carr*, 789 F. Supp. 3d 1200
(N.D. Ga. 2025); *NetChoice, LLC v. Griffin*, No. 5:23-cv-5105 (TLB), 2025 WL 978607
(W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105
(D. Utah 2024).

tailored to serve compelling state interests." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 766 (2018) (citation omitted). Defendants therefore attempt to lower the constitutional standard by arguing that the Act compels only *commercial* speech. But the Act compels fully protected speech under binding and persuasive precedent.

Second, the Act is independently unconstitutional because its mandates are unconstitutionally vague. The Act defines "[s]ocial media platform" in vague terms that leave websites uncertain about whether they are covered. § 325M.31(j). And for those websites that *are* forced to speak, the content of the State-mandated message can change on a dime, with no notice to regulated services. Plus, the Act does not clearly explain what counter-speech, if any, the regulated websites may engage in; instead, it prohibits "extraneous information in the warning label." § 325M.335(1)(c)(2). Defendants' responses do little to lend clarity to the Act.

Finally, there are no hurdles to the Court reaching the merits of NetChoice's claims. NetChoice has standing to raise both its members' and their users' First Amendment rights and interests. It has associational standing because its members are the direct objects of the Act, which Defendants do not challenge. That is sufficient for NetChoice to raise all claims in its complaint. Even if third-party standing principles applied, they are readily satisfied. The Act's warnings must be displayed—and "acknowledge[d]"—every time a user accesses the service, § 325M.335(1)(a)(1)-(2), making the Act an ongoing impediment to "vast realms of human thought and knowledge," *Packingham*, 582 U.S. at 107.

## Background

### A.     Statement of allegations

**1.     NetChoice members' websites disseminate and enable large amounts of fully protected speech.**

NetChoice is an internet trade association. ECF 22 ¶ 10 (First.Amend.Compl.). Based on the Act's definitions, the Act regulates websites operated by NetChoice members, including: (1) Automattic (Tumblr); (2) Discord; (3) Meta (Facebook, Instagram, and Threads); (4) Nextdoor; (5) Pinterest; (6) Reddit; (7) Snap Inc. (Snapchat); (8) TikTok Inc. and TikTok USDS Joint Venture LLC (TikTok); (9) X; and (10) YouTube. ECF 22 ¶ 12.

Each of these websites "engages in expression" by "displaying" "distinctive expressive offerings" of "third party speech," according to their respective "community guidelines." *Moody*, 603 U.S. at 716-17, 738, 744 (citation modified); ECF 22 ¶ 23. These websites also facilitate user speech, by allowing users "to share [content] with others" who can then "react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719; ECF 22 ¶¶ 21-22.

**2.     The merits of social media are the subject of significant debate, and ample private resources exist to provide users with information about social media use and to assist parents with overseeing their minor children's internet use.**

Social media use is intensely debated across academia, courts, and society. Even the threshold question of what constitutes "social media" is unsettled, and the literature on its mental health effects is sharply contested. ECF 22 ¶ 85. As a result, there is not sufficient "evidence regarding the negative mental health impacts of social media platforms." § 325M.335(2)(b); ECF 22 ¶ 86.

4

As the former U.S. Surgeon General concluded, there are many potential "benefits of social media use among children and adolescents"—including facilitating (1) "positive community and connection with others who share identities, abilities, and interests"; (2) "access to important information"; (3) "a space for self-expression"; and (4) the opportunity to "form and maintain friendships online and develop social connections." U.S. Surgeon Gen., Advisory: Social Media and Youth Mental Health 6 (2023), https://perma.cc/A9MQ-KZWR ("Advisory"); ECF 22 ¶ 89. "[B]uffering effects against stress that online social support from peers may provide can be especially important for youth who are often marginalized, including racial, ethnic, and sexual and gender minorities." Advisory at 6; ECF 22 ¶ 89.

Yet there are "[k]nown evidence gaps" regarding social media use and mental health:

> The relationship between social media and youth mental health is complex and potentially bidirectional. . . . Most prior research to date has been correlational, focused on young adults or adults, and generated a range of results. Critical areas of research have been proposed to fill knowledge gaps and create evidence-based interventions, resources, and tools to support youth mental health. Thus, there is an urgent need for additional research.

Advisory at 11; ECF 22 ¶ 88.

Minnesota has ample ways to express its views in this debate. Governmental actors can and do engage in their own speech about social media and provide resources themselves. ECF 22 ¶¶ 24-28; *see* Minn. Dep't of Educ., Digital Literacy and Internet Safety (2025), https://perma.cc/54AS-DCWH; Minn. Dep't of Health, THE MINNESOTA

5

PARTNERSHIP FOR ADOLESCENT HEALTH: Safe and Secure Places to Live, Learn, and Play (June 17, 2025), https://perma.cc/9SQS-N7MD.

Many covered websites and private entities are committed to promoting beneficial uses of social media. NetChoice members themselves build parental controls, partner with researchers, moderate content, and publish guides on digital wellbeing. ECF 22 ¶¶ 29-35.

**B.    Minnesota HF2 Article 19, Section 13**

**1. Regulated platforms.** The Act regulates "[s]ocial media platform[s]": any "electronic medium . . . that allows an account holder to create, share, and view user-generated content for a substantial purpose of social interaction, sharing user-generated content, or personal networking." § 325M.31(j).

Among these "social media" websites, the Act applies only to those that "(1) do[] business in Minnesota or provide[] products or services that are targeted to residents of Minnesota; and (2) ha[ve] more than 10,000 monthly active account holders located in Minnesota." § 325M.32(a).

Minnesota also excludes more than 15 different kinds of preferred websites from the Act's requirements—often discriminating based on content:

> (4) a streaming service, online video game, e-commerce, or other Internet website where the content is not user generated but where interactive functions enable chat, comments, reviews, or other interactive functionality that is incidental to, directly related to, or dependent upon providing the content;
> . . .
> (6) an advertising network with the sole function of delivering commercial content;
> . . .
> (9) single-purpose community groups for education or public safety;
> . . .

6

(11) cloud computing services, which may include cloud storage and shared document collaboration;

(12) providing or obtaining technical support for a platform, product, or service; or

(13) a platform designed primarily and specifically for creative professional users, as distinct from the general public, to share their portfolio and creative content, engage in professional networking, acquire clients, and market the creative professional user's creative content and creative services through facilitated transactions.

§ 325M.31(j).

**2. The Act's compelled-speech warning requirements.** The Act compels covered websites to display a "conspicuous . . . warning label"—authored by the State—"each time a user accesses the" service. § 325M.335(1)(a). That requirement applies to all users, regardless of age.

These compelled warnings must: "(1) . . . warn the user of potential negative mental health impacts of accessing the social media platform; and (2) provide the user access to resources to address the potential negative mental health impacts . . . and include the website and telephone number of a national suicide prevention and mental health crisis hotline system." § 325M.335(1)(b). The messages must "appear[] *each time* a user accesses the" website, no matter how many times the user has previously seen the message. § 325M.335(1)(a)(1) (emphasis added). And the warning can "only disappear[] when the user: (i) exits the social media platform; or (ii) *acknowledges the potential for harm* and chooses to proceed . . . *despite the risk*." § 325M.335(1)(a)(1)-(2) (emphases added). Users may not "disable a warning label." § 325M.335(1)(c)(3).

Defendant Commissioner of Health has already *twice* "develop[ed] guidelines for social media platforms that contain appropriate requirements" for the mandated warning

7

labels based on her interpretation of an undisclosed and self-selected set of "current evidence regarding the negative mental health impacts of social media platforms." § 325M.335(2)(a); *see* ECF 22 ¶ 74. Although the guidelines were not issued with notice and comment and were exempt from the State's Administrative Procedure Act, they carry the "force of law." § 325M.335(2)(b); § 14.386(e); *see* ECF 22 ¶ 76.

*Rescinded Guidelines warnings.* The State first issued "Guidelines" on February 27, 2026. These rescinded guidelines included four pages of warning labels, which made broad, hotly disputed assertions about the websites and the speech they provide. ECF 22 ¶ 78.

*New Guidelines warning.* The State's current "Guidelines"—issued June 1, 2026, after this litigation began—require covered services to display to their users the following state-mandated message:

> THE STATE OF MINNESOTA REQUIRES THIS MESSAGE: Some studies have shown that too much social media use is linked to increased mental health symptoms, including anxiety and depression, as well as harm to diet, sleep, and body image. If you need help, call or text 988 or visit 988Lifeline.org.

Minn. Dep't of Health, Minnesota Social Media Mental Health Warning Label Guidelines (June 1, 2026), https://perma.cc/ML5R-H9YX ("DoH Guidelines"). The Guidelines do not explain what studies this warning purportedly describes.

**3. Enforcement**. Defendant Minnesota Attorney General has the authority to "investigate and bring an action against a social media platform for an alleged violation" of the Act. § 325M.34(a).

8

**Standard**

Under Rule 12(b)(6), the question is whether NetChoice's complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face' and plead[s] 'factual content that allows the court to draw the reasonable inference that the'" Act is unconstitutional. *Mo. Broads. Ass'n v. Lacy*, 846 F.3d 295, 300 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This Court must "accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Id.* (quoting *McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015)).

Defendants' motion improperly relies on factual material that is not "embraced by the complaint," which "may not be considered in deciding a Rule 12 motion to dismiss." *Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742, 747 (D. Minn. 2022) (citation omitted). Accordingly, this Court should not credit Defendants' reliance on this extra-complaint material, including any studies, reporting, or public statements. *See* ECF 27 at 2-5, 7, 10-11, 21, 28, 36.

**Argument**

I.   **NetChoice has plausibly stated a claim that the Act's compelled-speech requirements violate the First Amendment.**

   A.   **The First Amendment prohibits compelled-speech mandates like the Act's compelled warnings.**

"In this Nation, no official . . . may command our tongues." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026). The First Amendment protects "both the right to speak freely and

the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (quoting *Wooley*, 430 U.S. at 714).

The First Amendment's prohibitions on compelled speech are robust and broad. It does not "matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include. All that offends the First Amendment just the same." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586-87 (2023) (citations omitted). And "this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). All manner of private entities have the right to be free from compelled speech—from hardware stores to book publishers to "social-media platforms." *Moody*, 603 U.S. at 719.

Here, the Act is facially unconstitutional because it "requires *every* covered social media platform to perform the same task under the Act: provide" users with state-authored warnings about the alleged "impacts of social media use on their mental . . . health." *Weiser*, 808 F. Supp. 3d at 1231-32; *see* ECF 22 ¶¶ 80-84. So "to the extent [the Act] offends the First Amendment, it does so in the same material way" for every regulated entity. *Weiser*, 808 F. Supp. 3d at 1232. The Ninth Circuit in analogous cases held that laws compelling speech "raise the same First Amendment issues" "in every application to a covered social media company." *X Corp.*, 116 F.4th at 899; *Bonta I*, 113 F.4th at 1116. At a minimum, the Act is invalid as applied to NetChoice members' regulated services.

10

*John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff).

> **B.     The Act's warning-notification requirements trigger strict First Amendment scrutiny—and not commercial-speech scrutiny—for two independent reasons.**

The Act's compelled-speech requirements trigger strict scrutiny as content-based regulations of speech, for two independent reasons. First, "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). Second, the Act selects websites for compelled speech based on the content they generally disseminate.

Content-based laws are "'presumptively unconstitutional and may be justified only if' they satisfy strict scrutiny." *FSC*, 606 U.S. at 471 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). For their part, Defendants agree that the "Act is a content-based regulation" and that content-based laws are "often subject to strict scrutiny." ECF 27 at 9.

> **1.     The Act's requirements trigger strict scrutiny as compelled speech.**

The Act's warning requirements unconstitutionally compel covered websites to engage in speech, triggering strict scrutiny.

The parties agree that compelled-speech requirements generally trigger strict First Amendment scrutiny. *See* ECF 27 at 9. "When a state compels individuals to speak a particular message, the state alters the content of their speech, and engages in content-based regulation." *Weiser*, 808 F. Supp. 3d at 1235 (citation modified) (quoting *NIFLA*, 585 U.S. at 766).

Here, the Act compels speech—highly controversial speech, no less—by requiring covered websites to publish a "conspicuous mental health warning label" authored by the State to all their users (both adults and minors). § 325M.335(1)(a)(1), (b). These warnings "require social media companies to opine on the impacts of social media use on [users'] mental and physical health"—which "pertain to expressive issues of significant social, political, and scientific concern." *Weiser*, 808 F. Supp. 3d at 1236.

### 2. The Act's central coverage definition is content-based, which independently triggers strict scrutiny.

The Act's central "social media platform" coverage definition is content-based. § 325M.31(j). This independently subjects the Act's compelled warnings to strict scrutiny.

Where a law's "coverage provision" "requires consideration of [websites'] content," that law is content based. *Murrill*, 812 F. Supp. 3d at 644. Here, the Act defines the scope of covered websites based on their "subject matter" and thus "content." *Reed*, 576 U.S. at 163 (citation omitted).

For example, the Act excludes a host of websites based on the subject matter presented on that particular website, such as "single-purpose community groups for education or public safety" and networking websites for "creative professional users." § 325M.31(j). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

And the Act's coverage definition distinguishes user-generated content from other kinds of content. *See* § 325M.31(j). It distinguishes between websites that "allow[] an

12

account holder to create, share, and view *user-generated* content for a substantial purpose of *social interaction*" and websites that disseminate one-way institutional speech (*e.g.*, "streaming") or foster other types of interaction (*e.g.*, business, commercial). *Id.* (emphases added). "[B]ecause . . . the Central Coverage Definition facially distinguishes between 'social' speech and other forms of speech, it is . . . content based." *Reyes*, 748 F. Supp. 3d at 1121-23; *see Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1038 (W.D. Tex. 2024) (similar).

Thus, even if the Act's compelled warnings involved only purely factual, uncontroversial commercial speech (they do not, as addressed below), the fact that the Act imposes this speech burden in a content-discriminatory manner subjects it to strict scrutiny. The State certainly could not force only speakers who have criticized the Minnesota legislature to make factual disclosures without satisfying strict scrutiny, no matter how anodyne the disclosures themselves are. Doling out differential burdens based on the content of speech offends the First Amendment all the same. That is what this Act does.

> **C.    Contrary to Defendants' arguments, the Act does not regulate or compel commercial speech and thus *Zauderer*'s standard of review does not apply.**

Defendants concede that the "Act is a content-based regulation." ECF 27 at 9. And the Supreme Court has emphasized that laws compelling disclosures are generally treated no differently from any other content-based regulations of speech. *E.g.*, *NIFLA*, 585 U.S. at 771. Defendants contend, however, that this Court should apply *Zauderer*'s narrow exception to that rule. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). That is wrong for three independent reasons.

First, as demonstrated above at pp.12-13, the Act's *scoping* is content-based, so strict scrutiny applies regardless of whether the Act regulates commercial speech. Second, the Act's compelled disclosures do *not* regulate commercial speech under either the Eighth Circuit's multi-factor test or the other precedent that Defendants cite. And finally, even if the Act regulated commercial speech, the required disclosures are not "purely factual and uncontroversial" disclosures about a company's own services to cure "inherently misleading" commercial "advertisements." *Zauderer*, 471 U.S. at 641, 651.

**1.    Defendants have not demonstrated that the speech at issue is commercial speech under the Eighth Circuit's multi-factor test.**

Under Eighth Circuit precedent, the Act regulates and compels fully protected speech, not just commercial speech.

"'[C]ore' commercial speech 'does no more than propose a commercial transaction.'" *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999) (quoting *Cincinnati v. Discovery Network*, 507 U.S. 410, 423 (1993)); *accord United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (commercial speech is "usually defined as speech that does no more than propose a commercial transaction"). Outside of that "core," the Eighth Circuit considers three factors to identify commercial speech: "(i) whether the communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech." *Porous*, 173 F.3d at 1120. Applying those factors here confirms this Act does not regulate commercial speech. *Weiser*, 808 F. Supp. 3d at 1236-37.

14

*First*, social media websites are not "advertisement[s]," because they do not "propose a commercial transaction." *Porous*, 173 F.3d at 1120 (citation omitted); *see Weiser*, 808 F. Supp. 3d at 1236. Nor do the warnings address the terms of a commercial transaction.

Defendants agree that the disclosures do not "propose a commercial transaction." ECF 27 at 10 (citation omitted). So Defendants instead say that the disclosures "occur[] 'in the context' of" a commercial transaction because "[t]he crux of the relationship between social media platforms and users is commercial." ECF 27 at 10 (citation omitted). In support, Defendants improperly rely on extrinsic sources and say that online services (1) have terms of service; and (2) display third-party advertising to their users. ECF 27 at 10-11.

These arguments cannot be considered at this stage. But regardless, they still do not show that the Act regulates only commercial speech. Defendants' argument would suggest that essentially *all* websites are "commercial speech." After all, "[m]any websites . . . authorize a user's access only upon his agreement to follow specified terms of service." *Van Buren v. United States*, 593 U.S. 374, 394 (2021). That does not mean that the government can regulate everything on the service as "commercial speech." That is to say nothing of the "transactions" necessary to purchase books, newspapers, and concert tickets. To regulate commercial speech, the Act would need to apply directly to speech regarding some commercial transaction. It does not.

And even assuming the terms of service constituted that type of transaction, the Act does not require disclosures only at the time that users enter into terms of service. Rather,

15

the Act compels its warnings to "appear[] *each time* a user *accesses* the" website. § 325M.335(1)(a)(1) (emphases added). Defendants say that "sign[ing] in" "initiates a new commercial transaction." ECF 27 at 11. But they cite nothing for the position that merely using a service—for example, somebody accessing X or Threads to see their Senator's latest post or to post their own musical performances on Instagram, YouTube, or TikTok— is a "commercial transaction."

Likewise, the fact that a subset of content on the platforms is third-party advertisements does not make all the speech commercial. The compelled speech here "does not *specifically* target the commercial speech that allegedly occurs on those websites by third-party advertisers." *Weiser*, 808 F. Supp. 3d at 1239. "[S]ocial media" websites disseminate "a staggering amount of content," including all manner of fully protected speech. *Moody*, 603 U.S. at 719. True, social media websites publish some third-party ads. So does the *Star Tribune*. If ads alone could strip a speaker of full First Amendment protection, every newspaper, broadcaster, and streaming service would lose it. For example, "much of the material in ordinary newspapers is commercial speech." *Discovery Network*, 507 U.S. at 423. Yet newspapers are not commercial speech as a result. *Id.* So whatever advertisements might appear on covered websites here, they are "inextricably intertwined with otherwise fully protected speech." *Riley*, 487 U.S. at 796.

The Ninth Circuit has decided a pair of cases rejecting online compelled-speech requirements that are illustrative. *Bonta I* held unconstitutional a California law "requiring covered [online] businesses to opine on potential harm to children" from use of their respective services. 113 F.4th at 1117. It concluded that strict scrutiny applied, because the

16

"requirement . . . regulate[d] far more than mere commercial speech" and was "discon-nected from any economic transaction." *Id.* at 1119. "[T]hat a business may earn revenue from its services" does not "render its opinions about those services 'commercial.'" *Id.* at 1120 (citation omitted).

The Ninth Circuit in *X Corp.* likewise held unconstitutional a separate California law, which required digital services to "detail the company's policies and actions concern-ing certain state-specified categories of content." 116 F.4th at 899. *X Corp.* concluded these requirements did not regulate or compel commercial speech, and "report[ing] whether and how they believe particular, controversial categories of content should be defined and reg-ulated on their platforms" did not qualify for lesser scrutiny. *Id.* at 901-03.

*Second*, the warning requirements do not "refer[] to a *specific* product or service." *Porous*, 173 F.3d at 1120 (emphasis added); *see Bonta I*, 113 F.4th at 1120. In fact, the Act does not concern any particular website or service at all. Instead, the Act requires warnings about "social media," writ large.

The Act's genericized scope of coverage is one of its key constitutional defects. There is no consensus definition of "social media" among researchers or the public. ECF 22 ¶ 85. "Social media" is not a commodity like nicotine or mercury. It is *speech*. And it refers to a collection of digital services that is defined differently study-to-study, State-to-State, and family-to-family. As a result, different scholarship about the impacts of social media analyzes different platforms. *E.g.*, *Murrill*, 812 F. Supp. 3d at 651 (State's expert "could not supply consensus definitions of 'social media' or 'mental health'"). The scholarship necessarily does not contain information about even a sizable fraction of every social media

17

website regulated by the Act. In practice, therefore, the Act requires the vast majority of covered websites "to disclose information about" what the State thinks is true of *other websites*. *NIFLA*, 585 U.S. at 768. For example, NetChoice-member Nextdoor would need to explain what the scholarship says about other websites entirely.

Imagine the government compelled video games to warn about the "impacts" of video games on users, irrespective of what kind of content the video game features. Requiring *Mario Kart* or *Candy Crush* to opine about the potential risks of video games based upon scholarship analyzing *Grand Theft Auto* and *Call of Duty* is not an acceptable warning requirement—even if they are all "video games." The same is true here.

Defendants respond that the current state of the evidence is somehow NetChoice members' fault. ECF 27 at 14-15. Again, nothing in NetChoice's complaint supports this factual assertion. Nor could Defendants claim that NetChoice members are the reasons that existing social science does not analyze the myriad platforms regulated by the Act.

*Finally*, covered websites do not have "an economic motivation for the speech," in the relevant sense. *Porous*, 173 F.3d at 1120. True, many covered websites operate for profit. So does the publisher Random House. So does *The Wall Street Journal*. That profit motive is "insufficient by itself" to transform their entire expressive offerings into "commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983). The "First Amendment extends to all persons engaged in expressive conduct, including those who seek profit." *303 Creative*, 600 U.S. at 600. "Otherwise, virtually any newspaper, magazine, or book for sale could be considered a commercial publication." *Ariix, LLC v.*

18

*NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) (collecting cases), cited by ECF 27 at 9; *see Weiser*, 808 F. Supp. 3d at 1238.

> **2.    The speech at issue is not commercial under other binding or persuasive precedent.**

Defendants largely do not apply the *Porous* factors. Rather, they argue that other "[p]recedent dictates that the Warning Label is commercial speech." ECF 27 at 10. But Defendants either misstate what that precedent holds or ignore that the precedent actually supports NetChoice.

*First*, *Moody* did *not* "treat[] th[e] laws" at issue in that case "as regulating commercial speech." ECF 27 at 10. *Moody* considered a pair of Florida and Texas laws that restricted online platforms' exercise of editorial discretion over the content on their services. 603 U.S. at 717. *Moody*'s majority opinion says nothing about commercial speech. *Contra* ECF 27 at 10. In evaluating Texas's law, the Court declined to "decide whether to apply strict or intermediate scrutiny" because "Texas's law d[id] not pass" either. *Moody*, 603 U.S. at 740. If the Supreme Court "treated" that Texas law as regulating "commercial speech," ECF 27 at 10, it would not have suggested that strict scrutiny could apply (which *Moody* otherwise left open). Later, the majority analogized social media content curation to the editorial decisions in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256, 258 (1974) (newspapers), and *Hurley*, 515 U.S. at 570 (parade organizers). *Moody*, 603 U.S. at 728, 730.

True, Justice Thomas's concurrence in the judgment observed that, "with respect *to certain provisions* of H. B. 20 and S. B. 7072, the Court assume[d] that the framework

19

outlined in *Zauderer . . .* applies." *Moody*, 603 U.S. at 750-51 (Thomas, J., concurring in the judgment) (citation omitted; emphasis added). The portion of the majority opinion that Justice Thomas was referring to instructed the lower courts to "address [those particular] provisions" in light of the Court's holding that "Facebook and YouTube are engaged in expression when they make content-moderation choices in their main feeds." *Id.* at 727 n.3. The Court said that the lower courts must determine whether "they unduly burden expressive activity." *Id.* (citing *Zauderer*, 471 U.S. at 651).[3]

So *Moody* does not establish that *all* compelled disclosures from "social media" are somehow "commercial speech," let alone for a law like this Act which (1) regulates a different set of online services; and (2) compels altogether different (state-authored) speech.

*Second*, the Second Circuit's certification order in *Volokh v. James* supports NetChoice—not Defendants. 148 F.4th 71 (2d Cir. 2025), *certified question answered*, No. 58, 2026 WL 1790976 (N.Y. June 23, 2026); *contra* ECF 27 at 10.

*Volokh* holds that "compel[ling] controversial speech . . . unconstitutionally burden[s] the social media networks' First Amendment rights" under any standard of First Amendment scrutiny. 148 F.4th at 90. That case considered a challenge to a New York law requiring particular online services to disclose their content-moderation policies:

> Each social media network shall have a clear and concise policy readily available and accessible on their website and application which includes how such

---

[3] Even if Justice Alito's separate writing at an earlier stage of the case had some precedential value, that writing discussed *Texas's* argument that some of the compelled disclosures in that case were subject to *Zauderer* review. *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715, 1717-18 (2022) (Alito, J., dissenting from vacatur of stay of preliminary injunction) ("The State notes that we have upheld laws requiring that businesses disclose [information] . . . [under] *Zauderer*." (citation omitted)); *contra* ECF 27 at 10.

20

social media network will respond and address the reports of incidents of hateful conduct on their platform.

*Id.* at 80 (quoting N.Y. Gen. Bus. Law § 394-ccc(3)). The parties disputed what speech this law compelled. The plaintiffs argued that New York's law required platforms to "speak about and take a position on speech the State characterizes as 'hateful conduct.'" *Id.* at 89. The Second Circuit agreed that this interpretation of the law "would compel controversial speech" and "burden the social media networks' First Amendment rights." *Id.* at 90.

Defendants focus on another portion of *Volokh*, suggesting that an alternative construction of the New York statute could be constitutional, if it "merely requires social media networks to publicly disclose their content moderation policies, whatever those policies may be." *Id.* at 89. Such a disclosure requirement could "relate to the social media services Plaintiffs actually provide to consumers" and would not require websites to "adopt any particular policy." *Id.* at 91. Under those circumstances, requiring online services to disclose their existing policies may be akin to compelling information about, for instance, calorie counts. *Id.* at 87 (collecting cases).

Consequently, *Volokh* establishes the following dichotomy: (1) laws that compel private entities to speak the State's preferred message are subject to heightened First Amendment scrutiny; and (2) laws that compel private entities to disclose their own pre-existing policies about their own services may satisfy First Amendment scrutiny. Here, Minnesota's Act falls in the first category because Minnesota requires covered platforms to speak the State's "controversial speech." *Id.* at 90.

21

*Third*, *Maryland Shall Issue, Inc. v. Anne Arundel County* does not support Defendants. 91 F.4th 238 (4th Cir. 2024) (summary judgment). That case concerned a law requiring firearms retailers to distribute a pamphlet about suicide prevention at the point of sale for firearms. *Id.* at 242-43. The court concluded that the pamphlet was factual and uncontroversial because the record *at summary judgment* supported what the pamphlet said: "(1) that there is 'no single cause' for suicide . . . ; (2) that 50% of all suicides are committed with firearms; (3) that access to firearms is a 'risk factor' that increases 'the chance' of suicide; and (4) that the risk can be reduced by the safe storage of firearms." *Id.* at 249-50 (emphasis omitted). That is a far cry from the Act here, where everything down to how to define "social media" is disputed at this motion-to-dismiss stage.

*Finally*, Defendants' drive-by citations fare no better. *Contra* ECF 27 at 10-12.

To begin, some cases support NetChoice—and demonstrate that Defendants should not prevail even if this Act regulated commercial speech. Take *Ass'n of Home Appliance Mfrs. v. Weiser*, 826 F. Supp. 3d 1302 (D. Colo. 2025) (preliminary injunction). Although that case concluded that mandated warnings on gas stoves were commercial speech, the law was "objectively controversial because there [was] robust disagreement by scientific sources concerning the validity of the statements." *Id.* at 1314, 1316. Likewise, *DoorDash, Inc. v. City of New York* did not apply *Zauderer* to informational disclosures of customer data it concluded were commercial speech—and instead held that the law failed intermediate scrutiny. 789 F. Supp. 3d 337, 355, 359 (S.D.N.Y. 2025) (summary judgment).

Other cases upholding laws under the First Amendment provide little support to Defendants. For instance, *X.AI LLC v. Bonta* concerned a statute requiring AI developers

to disclose a summary of their own datasets. No. CV 25-12295 JGB (SSCx), 2026 WL 626926, at *6-7 (C.D. Cal. Mar. 4, 2026) (denying preliminary injunction). Here, in contrast, the State is compelling online services to adopt the State's view of a contested and controversial issue and propound that view to their users over and over.

Similarly, cases discussing routine factual disclosures about commodifiable and generalizable products tell the Court little about this Act's warnings regarding contested social and scientific scholarship about online services that disseminate speech. *E.g.*, *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 21-25 (D.C. Cir. 2014) ("*AMI*") (country of origin); *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 131-34 (2d Cir. 2009) (restaurant calorie counts). And *SEC v. Musk* is even further afield. 826 F. Supp. 3d 35 (D.D.C. 2026). That case concerns an alleged failure to disclose ownership of more than 5% of a company's outstanding stock, which is a far cry from the controversial speech at issue here. *Id.* at 42-44, 47-48.[4]

> ### 3. *Zauderer*'s standard of review for purely factual and uncontroversial disclosures in commercial advertising does not apply to the Act's controversial compelled-speech requirements.

*Zauderer*'s standard of review does not apply here for multiple reasons. That exception—to the general rule that compelled speech triggers strict scrutiny—applies only to non-burdensome, "purely factual and uncontroversial" disclosures about a company's own

---

[4] For the reasons discussed above, the Court should not adopt the flawed commercial-speech analysis from *Students Engaged in Advancing Texas v. Paxton*, 177 F.4th 665, 669-70 (5th Cir. 2026) (per curiam).

services to cure "inherently misleading" commercial "advertisements." 471 U.S. at 641, 651.

*First*, as explained above at pp.15-16, the Act does not regulate commercial advertising. Because the Act does not compel commercial speech, *Zauderer*'s standard for "disclosure requirements for commercial speech" does not apply. *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1053 (8th Cir. 2014); *see Weiser*, 808 F. Supp. 3d at 1239 (collecting cases).

*Second*, as also explained above at pp.17-18, the Act is not "limited to . . . information about the terms under which [each covered website's] services will be available.'" *NIFLA*, 585 U.S. at 768 (cleaned up) (quoting *Zauderer*, 471 U.S. at 651).

*Third*, *Zauderer* does not apply because "the disclosure requirements do not appear to be 'reasonably related to the State's interest in preventing deception of consumers.'" *Jewell v. Herke*, 526 F. Supp. 3d 459, 468 (D. Minn. 2021) (Schiltz, J.) (quoting *Zauderer*, 471 U.S. at 651); *contra* ECF 27 at 16.

The Supreme Court has consistently described *Zauderer* as limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010); *e.g.*, *United Foods*, 533 U.S. at 416; *In re R.M.J.*, 455 U.S. 191, 205 (1982); *see Otto*, 744 F.3d at 1053 ("Under *Zauderer*, disclosure requirements for commercial speech are constitutional so long as they are reasonably related to the State's interest in *preventing deception of consumers*." (first emphasis added) (citation modified)).

24

Although Defendants suggest the Act addresses deception, there is no basis in NetChoice's complaint to support the idea that covered platforms are inherently or "self-evident[ly]" deceiving their users. *Contra* ECF 27 at 12, 16. That alone is enough to distinguish cases like *Zauderer* and *Otto*. In *Zauderer*, the State could require a disclosure in attorney advertising making clear that contingent-fee clients could be liable for legal "costs" even if they would not have to pay legal "fees": "The advertisement makes no mention of the distinction between 'legal fees' and 'costs,' and to a layman not aware of the meaning of these terms of art, the advertisement would suggest that employing appellant would . . . come entirely free of charge." *Zauderer*, 471 U.S. at 652. *Otto* was similar: Without disclosure, "consumers [would] have no idea that when they call 411-Pain" that "411-Pain puts them in touch . . . with chiropractors, not physicians." 744 F.3d at 1062.

*Fourth*, the compelled warnings here are neither "factual" nor "uncontroversial." *NIFLA*, 585 U.S. at 768 (citation omitted); *contra* ECF 27 at 13-15. The government cannot compel private entities to take sides on issues "subject to good-faith scientific or evidentiary dispute" or that are "part of a live, contentious political or moral debate." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024), *aff'd on other grounds*, 606 U.S. 461; *see Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (a subject matter can be "controversial" where there is "robust disagreement by reputable scientific sources" and "scientific debate" on that issue).

Social media use and its purported effects on mental health are subject to the kind of scholarly, social, and cultural debate that makes any warnings on the subject non-factual

25

and "controversial" for purposes of *Zauderer*. *See* ECF 22 ¶¶ 84-89.[5] To "warn the user of potential negative mental health impacts of accessing the social media platform," § 325M.335(1)(b), platforms would need to engage in multiple "contextual analyses, weighing and balancing many factors"—which "is anything but the mere disclosure of factual information." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024).

More concretely, consider the precise text of the State's latest Guidelines, which refer to the purported conclusions of "[s]ome studies": "Some studies have shown that too much social media use is linked to increased mental health symptoms, including anxiety and depression, as well as harm to diet, sleep, and body image. If you need help, call or text 988 or visit 988Lifeline.org." DoH Guidelines. The mandated warning does not provide any context about (1) what studies the warning references; (2) the methodology or quality of the studies; (3) the population(s) of users the studies purport to describe; (4) the magnitude of the purported "link[s]" the studies purportedly find; (5) the existence of contrary studies; (6) what services the studies purport to describe; (7) what "too much social media use" entails; and (8) other critical information necessary for users to assess the content of the State's warning.

By eliding those complexities, the Act's warning requirements "cross the line into compelled advocacy regarding a controversial issue." *Jewell*, 526 F. Supp. 3d at 468. The

---

[5] If this Court credits Defendants' extra-complaint evidence, *see supra* p.9, it should also take notice of additional sources highlighting the uncertainty in the literature. *E.g.*, Nat'l Acads. of Scis., Eng'g & Med., Social Media and Adolescent Health 94 (2024), https://perma.cc/YNR7-AQGU ("The committee's review of the literature . . . did not support the conclusion that social media causes changes in adolescent health at the population level.").

former U.S. Surgeon General acknowledged that "robust" analysis of social media has "not yet been conducted" and that "[m]ore research is needed to fully understand the impact of social media." Advisory at 4; ECF 22 ¶¶ 88-89. The Surgeon General stated that it is not clear whether social media use causes purported harms, purported harms lead to social media use, or something else is driving both. Advisory at 4, 11. "The relationship between social media and youth mental health is complex and potentially bidirectional." *Id.* at 11. The Advisory also notes research showing that "[s]ocial media can provide benefits for some youth by providing positive community and connection with others who share identities, abilities, and interests." *Id.* at 6. These benefits may be "especially important for youth who are often marginalized." *Id.*

Defendants respond, in essence, that the Act's warnings are "factual" because they accurately recount the findings of "some studies." This amounts to an argument that *any time* a study purports to find a particular conclusion, the government can compel private entities to relay those conclusions as "studies say . . ."

But *Zauderer* asks whether the underlying proposition is factually settled and uncontroversial—not whether the disclosure accurately cites a source that supports one side of the ongoing debate. That is why *Zauderer* asks whether there is "robust disagreement by reputable scientific sources" and "scientific debate." *Cal. Chamber of Com.*, 29 F.4th at 478. And in spite of Defendants' contrary claim, there is no "consensus" about what should even be considered "social media"—let alone the alleged effects that diverse social media platforms have on diverse users. *See* ECF 22 ¶¶ 84-89. There are certainly no facts in NetChoice's complaint supporting such an argument.

27

For similar reasons, the Act also compels "controversial" speech. *Contra* ECF 27 at 14-15. Here, the Act's compelled warning is "controversial for some reason other than dispute about simple factual accuracy" about what any one academic source—or any subset of academic sources—says. *AMI*, 760 F.3d at 27. A disclosure citing a paper claiming the earth is flat is not factually accurate or uncontroversial just because it accurately recounts the paper's conclusions. So, even if "the words the state puts into the [speaker]'s mouth are factual" because they recount some findings of some studies, "that does not divorce the speech from its moral or ideological implications." *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014). Here, the Act's warnings reflect the State's *opinion* or *view* that social media has negative impacts—a view that is subject to vigorous debate and scientific uncertainty.

Defendants' references to ongoing litigation help illustrate the point. ECF 27 at 7. Those cases show that the issue of *particular* online services' effects on minors is a topic being actively litigated and limited to a small handful of services.[6] Moreover, this ongoing litigation raises both the controversy and harm to covered companies under Minnesota's Act—as being forced to make statements about the purported impacts of social media under the Act could provoke additional claims in other litigation. This is the very essence of a controversial statement.

---

[6] The court presiding over much of this litigation recently ruled that many issues, including the question of whether Meta's platforms are "designed to be addictive" to minors, are the subject of "a genuine dispute of material fact." *In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No. 4:23-cv-05448-YGR, 2026 WL 1892681, at *4 (N.D. Cal. June 29, 2026).

28

In addition, the required notifications compel websites to engage in speech designed to deter users. That message of deterrence is "controversial," because it is "fundamentally at odds with" covered websites' missions to be open and available for all users to access the wide range of protected speech on their services. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1277-78 (9th Cir. 2023) (citation omitted); *e.g.*, ECF 22 ¶¶ 80-84.

Decisions from other Circuits help illustrate why *Zauderer* does not apply here.

The Fifth Circuit's decision in *Free Speech Coalition* invalidated compelled warnings about online speech. There, Texas required pornography websites to display "health warnings" to their users regarding pornography. 95 F.4th at 279. Even assuming that the disclosures were factual, the Fifth Circuit nevertheless concluded that they were not uncontroversial, so *Zauderer* review did not apply. *Id.* at 282. A "compelled statement is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *Id.* at 281-82 (citation omitted). Texas could not overcome that hurdle. *Id.* Nor can Minnesota here.

And when Illinois attempted to require warning labels for purportedly inappropriate sexual content in video games, the Seventh Circuit concluded that such warnings did not compel commercial speech and failed strict scrutiny. *See Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652-53 (7th Cir. 2006). Much like the purported "impacts" of social media use here, the State's view of the topic "is far more opinion-based than the question of whether a particular chemical is within any given product" and the private entity "may have an entirely different" view of the issue. *Id.* at 652; *see also Video Software Dealers*

29

*Ass'n v. Schwarzenegger*, 556 F.3d 950, 966 (9th Cir. 2009) (similar), *aff'd on other grounds sub nom. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011).

### D. The Act's warning-notification requirement fails strict scrutiny or any other form of heightened First Amendment scrutiny.

Defendants do not attempt to argue that the Act satisfies strict First Amendment scrutiny. ECF 27 at 20. So if this Court concludes that strict scrutiny applies, the Court should deny Defendants' motion.

Even assuming arguendo that commercial-speech intermediate scrutiny applied, Defendants cannot demonstrate that the Act "directly and materially advanc[es] the asserted governmental interest," and "is not more extensive than necessary to serve the interests that support it." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555-56 (2001) (citations omitted). Plus, the compelled speech is "unjustified [and] unduly burdensome" even if *Zauderer* review applied. *NIFLA*, 585 U.S. at 776.

At bottom, Defendants "ha[ve] not provided (and could not appropriately provide at this stage) any evidence that the Act advances at least important governmental interests and does not burden substantially more speech than is necessary." *Mox v. Olson*, No. 23-CV-3543 (ECT/ECW), 2024 WL 3526913, at *7 (D. Minn. July 24, 2024). Thus, "[r]egardless of whether the Act is subject to strict or intermediate scrutiny, the better answer is to deny the motion to dismiss." *Id.*

### 1. Minnesota lacks a sufficient governmental interest in compelling covered websites to disseminate controversial speech.

Minnesota lacks a sufficient governmental interest in compelling covered websites to publish the State's preferred message about social media use.

To satisfy any form of heightened First Amendment scrutiny, Minnesota must "specifically identify an actual problem in need of solving." *Brown*, 564 U.S. at 799 (citation modified); *see Reilly*, 533 U.S. at 555 (citation omitted) (under commercial speech intermediate scrutiny, "a governmental body . . . must demonstrate that the harms it recites are real"). "When defending" the Act, "the government 'must do more than simply posit the existence of the disease sought to be cured.'" *Minn. Right to Life v. Rashid*, No. 25-CV-02476 (NEB/DTS), ECF 47 (D. Minn. Oct. 20, 2025) (quoting *FEC v. Cruz*, 596 U.S. 289, 307 (2022)). Even "in commercial speech cases the government cannot rest on 'speculation or conjecture.'" *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 526 (D.C. Cir. 2015) (citation omitted). Here, the record lacks the factual basis to support the precise problems the State is attempting to solve through its compelled-speech requirements.

The State itself and many private sources already provide people with information about social media use. *See supra* pp.5-6. Many covered websites already publish information about online use, mental health, and wellbeing. *See supra* p.6. So there is no need for governmental regulation of private entities here. To the extent Defendants are asserting an interest in "protect[ing] *children* from harm," *Brown*, 564 U.S. at 794 (emphasis added), a State may not "protect the young from ideas or images that a legislative body thinks unsuitable," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975).

And families have many existing *private* tools available to ensure that minor children are responsibly using the internet, including by setting time limits or reminders to take breaks. *See supra* p.6. This is not "blam[ing] [the] parents." *Contra* ECF 27 at 8. Rather, those are precisely the kinds of private parental tools that the Supreme Court has endorsed

31

over governmental intervention. *E.g.*, *United States v. Playboy Ent.*, 529 U.S. 803, 826 (2000). And whatever "modest gap in concerned parents' control" the available parental tools leave open, if any, filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

### 2.    The Act's warning notification is not properly tailored.

The Act is not properly tailored under any level of First Amendment scrutiny. The State bears the burden of demonstrating that it satisfies heightened First Amendment scrutiny. "Ordinarily, that burden cannot be carried until the summary-judgment stage"—if ever. *Mox*, 2024 WL 3526913, at *7. This case is not the exception.

**a.** The Act's "compelled speech requirement is not the least restrictive means available for advancing" Minnesota's interests. *Weiser*, 808 F. Supp. 3d at 1240. Even under intermediate scrutiny, Defendants must "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

It "is evident that [Minnesota] had other options at its disposal for advancing its goal of protecting the health and well-being of its children from the potential adverse effects of social media use." *Weiser*, 808 F. Supp. 3d at 1240. One option was for Minnesota to "provide minors" and adults "with these disclosures itself." *Id.* The State is more than capable of pursuing its own "public-information campaign." *NIFLA*, 585 U.S. at 775; *see Bonta I*, 113 F.4th at 1121. Minnesota could put its warnings about social media on its own websites. Public officials could include these warnings in their own speeches, letters, and op-eds. Minnesota could run its own ads on television, radio, billboards, or even online.

32

Minnesota could require schools to provide digital literacy instruction to students and the broader public about technology and social media use. Another option would be for Minnesota to "incentivize[]" third parties or "social media companies to voluntarily provide these disclosures to . . . minor users." *Weiser*, 808 F. Supp. 3d at 1240. Third-party private sources are often better positioned to provide families with information about multiple types of services. They are certainly better positioned than some covered services to opine on other differently situated covered services.

**b.** The Act's compelled-speech warning requirements are "more extensive than necessary to serve [any] interests that support" them. *Reilly*, 533 U.S. at 556; *Packingham*, 582 U.S. at 105-06. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). Yet this Act does exactly that.

The Act compels speech from an overbroad collection of websites—perhaps hundreds or thousands of times per user, per year—based on a concern that *some* uses of *some* websites *sometimes* may harm *some* users. Defendants' Motion mentions only five services, ECF 27 at 3-4, 11, even though the Act compels speech from potentially thousands more. In fact, those five services are a fraction of the 12 that NetChoice identified as covered among just its own members. Even assuming that there were a sufficient factual basis to compel speech from those five services (there is not), the State must do more than point to those five websites to compel speech from many more.

That is a burden the State cannot carry because the Act does not purport to identify particular websites that are harmful. Nor does it attempt to limit its coverage to websites

with particular purportedly harmful features. Instead, the Act broadly targets websites that disseminate a broad range of protected speech and are home to "social interaction"—that is, places where users speak with each other. § 325M.31(j); ECF 22 ¶¶ 20-22, 61-65. The Supreme Court has rejected the notion that governments can penalize speech because of its "interactiv[ity]." *Brown*, 564 U.S. at 798. And the State's arbitrary 10,000-in-State-user coverage threshold does little to solve this problem.  § 325M.32(a). If anything, this user threshold makes it more likely the Act will compel warning notifications from larger websites, which are more likely already to offer parental controls and engage in content moderation—while leaving unregulated many websites that might lack such oversight.

On that overbroad collection of websites, the Act requires warning notifications for overbroad swaths of valuable, protected, and entirely innocuous speech. And it requires those warnings to be displayed to *all* users, even though Defendants largely focus on minors. For example, it would require warning notifications before a 25-year-old graduate student could watch educational lectures on YouTube or before a 45-year-old hobbyist could post her latest woodworking project on Instagram. Other examples abound.

Worse, the Act requires indiscriminate warning notifications about the purported harms of "social media." Yet there is no monolithic or commonly accepted understanding of "social media." The State's purported bases for these warnings can come only from existing literature examining a handful of online services (coming to equivocal conclusions), and not the wider range of what *this Act* calls social media. ECF 22 ¶¶ 85-87.

Nor is there any evidence that these warnings will be effective. Because of "the accumulation problem," consumers today "confront so many disclosures daily and so many

34

consequential disclosures yearly that they could not attend to (much less master) more than a few [disclosures] even if they wanted to." Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated Disclosure*, Harvard L. Sch. F. on Corp. Governance (May 6, 2014), https://perma.cc/YYL4-FKXD; ECF 22 ¶ 154.

Recent and more relevant precedent discussed above undermines Defendants' suggestion that mere "common sense" suffices to justify the Act's speech restrictions. ECF 27 at 20 (citing *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995), *in turn quoting Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality op.)). In any event, *Burson* considered an inapposite time-place-manner regulation prohibiting solicitation of votes within 100 feet of polling places, which was subject to the "exacting scrutiny" applicable to "political speech in a public forum." 504 U.S. at 198. That is a far cry from this Act's compelled-speech requirements.

Judge Clay's solo opinion in *NetChoice, LLC v. Yost*, 2026 WL 1758907, at *12-15 (6th Cir. June 18, 2026), upholding Ohio's distinct law under strict scrutiny is not to the contrary. No other panel member joined that reasoning. And for good reason. As the Supreme Court recently reaffirmed, strict scrutiny is "the most demanding test known to constitutional law," and is "fatal in fact absent truly extraordinary circumstances." *FSC*, 606 U.S. at 484-85. The notion that compelling speech from services as distinct as Pinterest and Nextdoor is the least restrictive means of protecting both minors and adults does not pass the straight-face test.

**c.** The Act is also "seriously underinclusive," which undermines the government's assertion of an important governmental interest. *Brown*, 564 U.S. at 802. The Act's central

definition and that definition's many exclusions create wide gaps in the State's regulatory regime. *See Sorrell*, 564 U.S. at 573 (explaining that speech regulation requires a "coherent policy"). Glaringly, the Act's regulatory regime entirely excludes websites that would meet the Act's definition of "social media platform"—implicating the State's purported interests—but have 10,000 or fewer "monthly active account holders located in Minnesota." § 325M.32(a). Nor does the Act apply to users spending multiple hours on gaming websites or streaming shows on Hulu. *Jones*, 822 F. Supp. 3d at 676-77.

**d.** Even if *Zauderer* scrutiny applied, the Act's compelled warnings are "unjustified and unduly burdensome." *NIFLA*, 585 U.S. at 778.

Here, the Act's compelled-speech requirement—which must be repetitively displayed to the same user potentially thousands of times per year—threatens to "drown[] out" the speech that covered websites present to users. *Id.*; *see Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 757 (9th Cir. 2019) ("the contrasting rectangular border containing a warning that covers 20% of the advertisement [would] drown out Plaintiffs' messages" (citation modified)). "[E]*ach* time" any user accesses covered websites, the websites must display the State's warnings, which will persist until the user "acknowledge[s]" them. § 325M.335(1)(a)(1)-(2) (emphasis added). This would substantially interfere with covered websites' dissemination of (and users' access to) "billions" of pieces of fully protected speech, including websites' "curated feeds." *Moody*, 603 U.S. at 718, 734.

36

## II.    The Act is unconstitutionally vague in key respects.

Both the Act's central "social media platform" coverage definition and the Act's operative compelled-speech warning requirements are unconstitutionally vague. §§ 325M.31(j), 325M.335(1)(b). Laws must "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). They cannot be "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *U.S. v. Williams*, 553 U.S. 285, 304 (2008). Otherwise, regulated entities may "steer far wider" than they would "if the boundaries . . . were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

**A.** NetChoice has standing to raise its facial vagueness claims. *Contra* ECF 27 at 20-22. Defendants' contrary argument relies entirely on their argument that the Act regulates only commercial speech. Because that argument is wrong, the Court can likewise dismiss this standing argument.

For similar reasons, this Court should apply the heightened vagueness standard that applies to laws implicating the First Amendment's protections for fully protected speech. *Contra* ECF 27 at 22. When government is regulating (and compelling) speech, the vagueness doctrine "demands a greater degree of specificity than in other contexts." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023) (citation omitted). Defendants' only argument to the contrary is that the law regulates commercial speech, which is wrong for the reasons discussed in Part I.C. ECF 27 at 22.

**B.** NetChoice has plausibly pleaded that the Act's "social media platform" coverage definition is unconstitutionally vague. *Contra* ECF 27 at 23-29.

37

At core, the Act requires platforms and the government to closely analyze the content on the website—and how users interact with that content—to determine whether the platform must parrot the State's message. The Act regulates any service "that allows an account holder to create, share, and view user-generated content for a substantial purpose of social interaction, sharing user-generated content, or personal networking"—unless the service is one of 13 other kinds of services defined and exempted according to their content. § 325M.31(j). That exercise is inherently fraught with subjectivity. And although some NetChoice members may have reasonable notice of whether their services must comply with the Act, *cf.* ECF 27 at 20-22, other NetChoice members have services where the Act's coverage provisions are unconstitutionally vague. *E.g.*, *Murrill*, 812 F. Supp. 3d at 659-61.

Defendants criticize NetChoice for "dissecting the Act's definition word-by-word." ECF 27 at 24. But for online services, the difference between being compelled to speak and remaining silent (as is their right) hinges on what the Act's coverage definition means. The State thought fit to provide a highly reticulated coverage definition—littered with exceptions. So the words Minnesota chose deserve careful scrutiny.

For instance, the Act's coverage turns on a website's "substantial purpose": whether it allows users to interact "for a substantial purpose of social interaction." § 325M.31(j). *Griffin II* permanently enjoined as vague a law relying on similar terms. 2025 WL 978607, at *15-16 (explaining that the law failed to define "primary purpose"). Here too, "substantial purpose" is undefined, yet the phrase is "critical to determining which entities fall within [the Act]'s scope." *Id.* at *15. It is difficult or impossible to banish only the "social" aspects of human interaction, or to know where the line is between "social" and, say,

38

"business" or "professional" interaction. Almost by definition, any medium that allows interaction of any kind allows social interaction, too. Thus, almost all websites that enable any kind of interaction among users could plausibly be covered by the Act if they meet the Act's other coverage requirements. Similarly, the Act "is ambiguous as to *whose . . .* 'purpose' is being considered—the user in creating the account or the company in making the forum available." *Griffin II*, 2025 WL 978607, at *16; *see Murrill*, 812 F. Supp. 3d at 660-61.

Defendants say courts need only "consider[] the purpose for which [the service] was designed." ECF 27 at 29. But that just highlights another problem: The Act's coverage provisions are especially vague as to mixed-use services that combine different features, *e.g.*, streaming, gaming, and social features. The Act offers no principle for resolving that uncertainty. Faced with these questions, websites must either submit to the Act's compelled-speech mandate or risk unpredictable fines. *Griffin II*, 2025 WL 978607, at *16. This is the chilling effect that "renders a law unconstitutional." *Id.*

On the merits, Defendants say that the Act relies on terms that are used in other contexts, purportedly without raising vagueness concerns. ECF 27 at 25-29. But that provides no "talismanic immunity" from a vagueness challenge where terms must be evaluated in context and "by standards that satisfy the First Amendment." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). Here, NetChoice has plausibly pleaded that the Act's coverage provisions are vague in many applications.

**C.** Even if websites could reliably determine whether they are covered, the Act is vague as to what those websites can and cannot say.

39

First, it is not clear what other information covered websites can provide their users without violating the Act's prohibition on "extraneous information in the warning label that obscures the visibility or prominence of the warning label." § 325M.335(1)(c). Rather than explain what counterspeech the Act allows, Defendants cite a dictionary and repeat the statutory language, saying "If the Warning Label can easily be seen, NetChoice members are free to include extraneous information." ECF 27 at 18 n.30. But it is not clear, for instance, where counterspeech disagreeing with the State's mandated message is "extraneous." Elsewhere in their brief, Defendants concede that the Act is designed to prevent social media from describing their services in "positive" and beneficial ways. ECF 27 at 3-4. Far from clarifying what speech the Act allows, Defendants' motion just underscores the uncertainty.

*Second*, the State can alter the content of the required warning without any notice to covered services, immediately altering what message the services must parrot. This is not hypothetical: The State has already issued two wildly different sets of proposed warning labels, without seeking any input from the public or regulated entities. ECF 22 ¶¶ 74-80.

Defendants respond that any law or regulation can be amended or rescinded. ECF 27 at 30-31. But that ignores the crux of NetChoice's allegation: *This regulation* can be altered at any time, for any reason, and without any notice (as it already has) because the State has exempted these regulations from the State's generally applicable administrative-law requirements. § 325M.335(2)(b); § 14.386(e). And Defendants notably do not disclaim their intent to change it again. So this claim does not "sound in administrative procedure." ECF 27 at 30.

40

III.    **NetChoice has standing for all claims and this Court can and should consider users' First Amendment rights in assessing NetChoice's First Amendment claims.**

NetChoice has standing to raise the interests of both its members and their users because "it is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights, at least *when the violation of those rights adversely affects the platform*." *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 807 (5th Cir. 2025) (emphasis added). So this Court should not prematurely dismiss NetChoice's claims that the Act violates the rights of NetChoice's members' *users*.

**A.** NetChoice plainly has Article III associational standing to raise its members' rights. *Id.* at 804-05. Every other court in the country to consider the question has agreed. *See supra* pp.1-2 n.2.

Here, NetChoice's members would have standing to sue in their own right because they are the object of the State's regulation. *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 532-33 (8th Cir. 2005). "Compelled speech in violation of the First Amendment is an injury in fact" sufficient to confer standing. *Henderson v. Springfield R-12 Sch. Dist.*, 163 F.4th 478, 494 (8th Cir. 2025).

Defendants do not seem to disagree. And they have not moved this Court to dismiss for lack of jurisdiction under Rule 12(b)(1). But—in arguing that NetChoice lacks standing to raise the interests of its members' *users*—Defendants say that NetChoice "has not identified a particular and concrete harm faced by its members, and therefore it cannot bring a claim on behalf of their users." ECF 27 at 32. To the extent that Defendants indeed argue that NetChoice's members do not suffer any First Amendment harm, that is wrong for the

41

reasons above. And to the extent Defendants mean that NetChoice has not established its *own* organizational injury, NetChoice "assert[s] the claims of its members" and thus stands in members' shoes. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977).

**B.** Because NetChoice has associational standing, it is unnecessary for the Court to additionally conclude that NetChoice can assert its members' *users'* rights as a matter of prudential standing.

In the First Amendment context, the rights of publishers and their audiences are intertwined. The constitutional "protection afforded is to the *communication*, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (emphasis added).

Here, NetChoice's members undoubtedly face First Amendment harms and their users' rights are an integral part of analyzing whether the Act "burden[s] substantially more speech than necessary." *McCullen*, 573 U.S. at 490.[7] As a result, the Supreme Court often considers third parties' First Amendment interests. In *Brown*, for instance, the only parties were associations of vendors who sold video games to minors. Those vendors (and their representative associations) have a First Amendment interest in selling fully protected speech. 564 U.S. at 790-92 & n.1. Yet nearly all of the Court's analysis focused on minors' rights—because they were essential to the ultimate constitutional question. *See Ashcroft v. FSC*, 535 U.S. 234, 252 (2002) (analyzing "rights of adults," in suit brought by publishers,

---

[7] So this is not a case in which plaintiffs with no First Amendment rights seek to bring a First Amendment claim on behalf of third parties. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955-56 (1984).

not consumers, of adult-oriented materials); *United States v. Playboy*, 529 U.S. 803, 815 (2000) (similar).

**C.** At any rate, even if "third-party standing" principles had some role to play here, they are easily satisfied. *Contra* ECF 27 at 31-34. Although a "plaintiff generally must assert his own legal rights and interests," the Supreme Court has "relaxed th[at] prudential-standing limitation" in the First Amendment context. *Munson*, 467 U.S. at 955-56. This permits parties to "challenge a statute not because their own rights of free expression are violated, but because . . . the statute's very existence may cause others not before the court to refrain from constitutionally protected speech." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (citation omitted).

That is true even outside of the First Amendment context, where plaintiffs have "standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted). In *Craig v. Boren*, a beer vendor could assert the equal-protection rights of her underage male customers, even though there was "no barrier whatever to Oklahoma males" raising the same challenge. 429 U.S. 190, 216 (1976) (Burger, C.J., dissenting). The vendor could "assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail." *Id.* at 195 (maj. op.). "In such cases," "'the obvious claimant' and 'the least awkward challenger' is the party upon whom the challenged statute imposes 'legal duties and disabilities.'" *June Med. Servs. v. Russo*, 591 U.S. 299, 319 (2020) (plurality op.) (citation omitted). So too here.

43

Defendants contend that NetChoice and its members have a "conflict" with users. ECF 27 at 34. Again, nothing in NetChoice's complaint provides the factual basis to support this argument. Regardless, any time the government attempts to regulate both vendors and their users, the government could claim there is some purported conflict. In *Craig*, it would have been easy enough to conclude that alcohol vendors had a conflict with—and were not acting in the best interest of—underage males. Nevertheless, the Supreme Court has consistently held in a variety of contexts that regulated parties may vindicate the rights and interests of third parties they are deputized into affecting. *Russo*, 591 U.S. at 319.

**D.** So NetChoice may challenge the Act because it (1) compels speech from users as a condition of access to the platforms; and (2) otherwise burdens users' access to the platforms. Although Defendants call these burdens "incidental," ECF 27 at 1, 18, 34-35, "for *fully protected speech*, 'the distinction between bans and burdens makes no difference.'" *FSC*, 606 U.S. at 493 n.12 (citation omitted). They must satisfy strict First Amendment scrutiny. Despite Defendants' citation to inapposite caselaw, there is no basis to conclude that the Act's burdens satisfy First Amendment scrutiny on the face of the complaint.

*  *  *

At this motion-to-dismiss stage, Defendants must carry two burdens under the First Amendment and Rule 12(b)(6). Minnesota carries neither: The State has compelled an overbroad and vaguely defined collection of social media websites to broadcast the State's view on a highly controversial and contested issue. It will be allowed to make its case that its warning for fully protected speech somehow satisfies constitutional scrutiny. But it cannot do so here.

44

## Conclusion

This Court should deny Defendants' motion to dismiss.

Dated: July 29, 2026                    Respectfully submitted,

/s/ Steven P. Lehotsky

Steven P. Lehotsky*                     FAEGRE DRINKER BIDDLE & REATH LLP
Serena M. Orloff*                       Aaron D. Van Oort (MN No. 315539)
Jeremy Evan Maltz*                      2200 Wells Fargo Center
LEHOTSKY COHN LLP                       90 South Seventh Street
200 Massachusetts Avenue, NW,           Minneapolis, MN 55402
  Suite 700                             Telephone: (612) 766-7000
Washington, DC 20001                    Facsimile: (612) 766-1600
(512) 693-8350                          Email: aaron.vanoort@faegredrinker.com
steve@lehotskycohn.com
serena@lehotskycohn.com
jeremy@lehotskycohn.com

*admitted pro hac vice

Attorneys for Plaintiff NetChoice